**PUBLISH**
**FOR THE TENTH CIRCUIT**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 24, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

RENEWABLE FUELS ASSOCIATION;
AMERICAN COALITION FOR
ETHANOL; NATIONAL CORN
GROWERS ASSOCIATION; NATIONAL
FARMERS UNION,

     Petitioners,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

     Respondent,

and

HOLLYFRONTIER CHEYENNE
REFINING, LLC; HOLLYFRONTIER
REFINING AND MARKETING, LLC;
HOLLYFRONTIER WOODS CROSS
REFINING, LLC; WYNNEWOOD
REFINING COMPANY, LLC,

     Intervenors – Respondents.

_____

THE AMERICAN FUEL AND
PETROCHEMICAL
MANUFACTURERS,

     Amicus Curiae.

No. 18-9533

———————————————————

**Petition for Review from an Order of the
Environmental Protection Agency
(EPA No. 1-3876)**

———————————————————

Matthew W. Morrison (Cynthia Cook Robertson and Bryan M. Stockton, with him on the briefs), Pillsbury Winthrop Shaw Pittman LLP, Washington, DC, appearing for Petitioners.

Patrick R. Jacobi, Environmental Defense Section, United States Department of Justice, Denver, Colorado (Jeffrey Bossert Clark, Assistant Attorney General, and Susan Stahle, Office of the General Counsel, United States Environmental Protection Agency, Washington, DC, with him on the briefs), appearing for Respondents.

Peter D. Keisler (C. Fredrick Beckner, III, Ryan C. Morris, and Peter C. Whitfield, with him on the briefs), Sidley Austin, LLP, Washington, DC, appearing for Respondents HollyFrontier Cheyenne Refining, LLC, HollyFrontier Refining & Marketing, LLC, and HollyFrontier Woods Cross Refining, LLC.

Brian H. Potts and Jonathan G. Hardin, Perkins Coie LLP, Madison, Wisconsin, on the briefs for Respondent Wynnewood Refining Company, LLC.

Richard S. Moskowitz, American Fuel & Pertrochemical Manufacturers, Washington, DC, and Robert J. Meyers and Thomas A. Lorenzen, Crowell & Moring, LLP, Washington, DC, filed an Amicus Curiae brief for American Fuel & Petrochemical Manufacturers, in support of Respondent.

———————————————————

Before **BRISCOE**, **KELLY**, and **LUCERO**, Circuit Judges.

———————————————————

**BRISCOE**, Circuit Judge.

———————————————————

I.   THE CLEAN AIR ACT, RENEWABLE FUELS, AND SMALL REFINERIES ...................7

    A.   LEGISLATIVE AND EXECUTIVE HISTORY .................................................7

    B.   REGULATIONS AND POST-ENACTMENT HISTORY ...................................17

    C.   THE EXEMPTION EXTENSION PETITIONS .................................................30

        1.   CHEYENNE ...................................................................................32

        2.   WOODS CROSS .............................................................................35

        3.   WYNNEWOOD ...............................................................................37

II.  THE BIOFUELS COALITION'S STANDING TO SUE .................................................38

III. OTHER JURISDICTIONAL ISSUES .........................................................................58

    A.   TIMELINESS ........................................................................................58

    B.   RIPENESS ............................................................................................61

IV.  THE BIOFUELS COALITION'S STATUTORY CONSTRUCTION CHALLENGES..........64

    A.   EXTENSION OF EXEMPTION .................................................................67

        1.   TEXTUAL ANALYSIS .....................................................................69

        2.   THE 2014 SMALL REFINERY RULE...............................................79

    B.   DISPROPORTIONATE ECONOMIC HARDSHIP ..........................................84

    C.   HARDSHIP FROM COMPLIANCE.............................................................87

V.   THE BIOFUELS COALITION'S ADDITIONAL CHALLENGES....................................89

VI.  MOTIONS ...........................................................................................................97

VII.    CONCLUSION ............................................................................................99

In the mid-2000s, Congress launched an effort to amend the Clean Air Act ("CAA") to try to reduce the nation's dependence on fossil fuels. The resulting legislation set ambitious targets for replacing specified volumes of crude oil fuel with renewable fuels. The legislation created several exemptions from this "biofuels" mandate, including a temporary exemption for small refineries if compliance in a given year would impose disproportionate economic hardship. The United States Environmental Protection Agency ("EPA" or "agency") is charged with implementing the legislation, and the agency has promulgated numerous regulations for that purpose.

At issue here are three EPA orders granting extensions of the small refinery exemption. Those orders were not made available to the public, for reasons later explained. The orders are being challenged by a group of renewable fuels producers who say they found out about the extensions through news articles or public company filings. We refer to these producers collectively as the Biofuels Coalition, and their petition to this court raises several important questions. The EPA opposes the Biofuels Coalition's appeal. So do the three recipients of the small refinery extensions, who have been granted leave to intervene.

As a preliminary matter, we conclude that the Biofuels Coalition has standing to sue. Constituents of the Biofuels Coalition have established an injury in fact in the form of lower prices, lower revenues, or increased competition with respect to the renewable fuels those constituents market and sell. For standing purposes, this injury is fairly traceable to the EPA's decisions to grant extensions of the three small

5

refinery exemptions in question. A favorable judicial decision is likely to redress at least some of this injury, assuming, as we must, that the EPA will continue to follow Congress's directive to implement and flesh out the renewable fuels program.

We also conclude that this court otherwise has jurisdiction over the matter. This case does not involve a challenge to a nationally-applicable agency rule, which challenge could only be heard in the United States Court of Appeals for the District of Columbia Circuit. The Clean Air Act contains a 60-day filing deadline with jurisdictional implications, but that deadline is triggered when final agency action appears in the Federal Register. The EPA never published the extension orders at issue. And although members of the Biofuels Coalition were not invited to participate in the proceedings that generated the orders, the record is sufficient (and the controversy is ripe) for judicial resolution.

On the merits, we agree in part with two of the Biofuels Coalition's three statutory construction arguments. The amended Clean Air Act allows the EPA to grant an "extension" of the small refinery exemption – not a stand-alone "exemption" – in response to a convincing petition. The statute limits exemptions to situations involving "extensions," with the goal of forcing the market to accept escalating amounts of renewable fuels over time. None of the three small refineries here consistently received an exemption in the years preceding its petition. The EPA exceeded its statutory authority in granting those petitions because there was nothing for the agency to "extend." Further, one of the EPA's reasons for granting the petitions was to address disproportionate economic hardship caused by something

6

other than compliance with the renewable fuels mandate. That, too, was beyond the agency's statutory authority. The Biofuels Coalition additionally claims that the EPA read the word "disproportionate" out of the statute, but we reject that argument.

Once we move from the topic of statutory authority, we disagree with almost all of the Biofuels Coalition's assertions that the EPA acted arbitrarily and capriciously in granting the extension petitions. We hold that the agency did abuse its discretion, however, by failing to address the extent to which the three refineries were able to recoup their compliance costs by charging higher prices for the fuels they sell. The EPA has studied and staked out a policy position on this issue. One of the refineries expressly raised the issue in its extension petition. It was not reasonable for the agency to ignore it.

I. THE CLEAN AIR ACT, RENEWABLE FUELS, AND SMALL REFINERIES

As background for our textual analysis, we briefly summarize the legislative and executive history of the pertinent amendments to the Clean Air Act, along with the law's provisions relating to small refineries. We summarize EPA regulations and post-enactment legislative and executive branch pronouncements concerning these small refinery provisions as well. We then describe the orders issued by the EPA granting the three small refinery extension petitions at the heart of this case.

A. LEGISLATIVE AND EXECUTIVE HISTORY

Congress changed the "Renewable Content of Gasoline" when it amended the Clean Air Act through the Energy Policy Act of 2005 ("Energy Policy Act"), Pub. L. No. 109-58, 119 Stat. 594. The Energy Policy Act directed the EPA to promulgate

7

regulations to ensure that gasoline sold or introduced into commerce in the United States included rising amounts of renewable fuel, going from four billion gallons in 2006 to seven and a half billion gallons in 2012. *Id.* §§ 1501(o)(2)(A)–(B). Renewable fuel targets for 2013 and beyond were to be determined later. *Id.* § 1501(o)(2)(B)(ii). The statute also created a "Credit Program" under which fuel refiners, blenders, or importers could buy or sell compliance credits. *Id.* § 1501(o)(5). The Energy Policy Act contained a "Temporary Exemption" until calendar year 2011 for small refineries, defined as those "for which the average aggregate daily crude oil throughput for a calendar year (as determined by dividing the aggregate throughput for the calendar year by the number of days in the calendar year) does not exceed 75,000 barrels." *Id.* §§ 1501(o)(1)(D), 1501(o)(9)(A)(i). The statute instructed the EPA to extend this exemption for at least two years for any small refinery identified in an upcoming study by the Department of Energy ("DOE") as suffering "disproportionate economic impact if required to comply[.]" *Id.* §§ 1501(o)(9)(A)(ii)(I)–(II).

Congressional reports on the proposals that became the Energy Policy Act foreshadowed these provisions. A House report stated that H.R. 1640 would increase the volume of renewable fuels from 3.1 billion gallons in 2005 to 5.0 billion gallons in 2012, and "would allow refineries, blenders, and importers to accumulate and trade credits[.]" H.R. Rep. No. 109-215, pt. 1, at 221, 270 (2005). A Senate report stated that a "major provision" of S. 10 would increase the volume of renewable fuels from four billion gallons in 2006 to eight billion gallons in 2012, with provisions relating

8

to "participation by small refiners" and "a fuel producer credit and trading program." S. Rep. No. 109-78, at 2, 18–19 (2005). The reports from both chambers discussed the overall policy objectives of the legislation. *See id.* at 1, 6 ("The widening gap between supply and demand, accompanied by reliance on foreign sources to close that gap, has created profound concerns in the Congress over the nation's energy security. . . . Coupled with those concerns is the recognition that meeting demand must be accomplished in an environmentally sound manner."); H.R. Rep. No. 109-215, pt. 1, at 169 ("Energy security is critical in a world of growing demand and regional political instability. Dependence on any single source of energy, especially from a foreign country, leaves America vulnerable to price shocks and supply shortages.").

President George W. Bush signed the Energy Policy Act into law. He stated that the bill "will strengthen our economy, and it will improve our environment, and it's going to make this country more secure." Remarks on Signing the Energy Policy Act of 2005 in Albuquerque, New Mexico, 41 Weekly Comp. Pres. Doc. 1262 (Aug. 8, 2005), *reprinted in* 2005 U.S.C.C.A.N. S17, S19. The President observed that "[t]he bill also will lead to a greater diversity of fuels for cars and trucks. The bill includes tax incentives for producers of ethanol and biodiesel. The bill includes a flexible, cost-effective renewable fuel standard that will double the amount of ethanol and biodiesel in our fuel supply over the next 7 years." *Id.* at 1264–65, S22. The President added that "[u]sing ethanol and biodiesel will leave our air cleaner. And every time we use a home-grown fuel, particularly these, we're going to be helping

9

our farmers and, at the same time, be less dependent on foreign sources of energy."

*Id.* at 1265, S22.

Congress expanded the provisions of the Energy Policy Act relating to renewable fuels – and further amended the Clean Air Act – through the Energy Independence and Security Act of 2007 ("Energy Independence and Security Act"), Pub. L. No. 110-140, 121 Stat. 1492. Those changes and others are now reflected in section 7545(o) of Title 42. The current version of the statute increases renewable fuel obligations in at least four categories: (1) renewable fuel, defined as "fuel that is produced from renewable biomass and that is used to replace or reduce the quantity of fossil fuel present in a transportation fuel," is targeted to rise from four billion gallons in 2006 to 36 billion gallons in 2022, 42 U.S.C. §§ 7545(o)(1)(J), 7545(o)(2)(B)(i)(I); (2) advanced biofuel, generally defined as renewable fuel "other than ethanol derived from corn starch" with lifecycle greenhouse gas emissions at least 50 percent less than baseline,[1] is targeted to rise from 0.6 billion gallons in 2006 to 21 billion gallons in 2022, *id.* §§ 7545(o)(1)(B), 7545(o)(2)(B)(i)(II); (3) cellulosic biofuel, defined as renewable fuel "derived from any cellulose, hemicellulose, or lignin that is derived from renewable biomass" with lifecycle greenhouse gas emissions at least 60 percent less than baseline, is targeted to rise from 0.1 billion gallons in 2010 to 16 billion gallons in 2022, *id.* §§ 7545(o)(1)(E),

---

[1] The statute defines "baseline lifecycle greenhouse gas emissions" as "the average lifecycle greenhouse gas emissions," as determined by the EPA, for "gasoline or diesel (whichever is being replaced by the renewable fuel) sold or distributed as transportation fuel in 2005." 42 U.S.C. § 7545(o)(1)(C).

7545(o)(2)(B)(i)(III); and (4) biomass-based diesel ("BBD"), defined with certain exceptions as renewable fuel that is "biodiesel" with lifecycle greenhouse gas emissions at least 50 percent less than baseline, was targeted to rise from 0.5 billion gallons in 2009 to one billion gallons in 2012, with volumes in later years to be set by the EPA in consultation with the DOE. *Id.* §§ 7545(o)(1)(D), 7545(o)(2)(B)(i)(IV), 7545(o)(2)(B)(ii).

As amended, this portion of the Clean Air Act contains additional provisions on greenhouse gas emissions. For renewable fuel produced from new facilities commencing production after December 19, 2007, the law states that such fuel must achieve "at least a 20 percent reduction in lifecycle greenhouse gas emissions compared to baseline lifecycle greenhouse gas emissions." *Id.* § 7545(o)(2)(A)(i). Several emissions are each identified as a "greenhouse gas," and the EPA is authorized to include, after notice and comment, "any other anthropogenically-emitted gas" determined "to contribute to global warming." *Id.* § 7545(o)(1)(H). The term "lifecycle greenhouse gas emissions," in turn, is defined to include the aggregate quantity of emissions "related to the full fuel lifecycle" where "the mass values for all greenhouse gases are adjusted to account for their relative global warming potential." *Id.*

The statute directs the EPA to issue regulations to ensure that the requirements of the law are met. *Id.* § 7545(o)(2)(A)(iii). The statute also directs the EPA, after receiving an estimate of renewable fuel volumes from the Energy Information Administration ("EIA") by October 31 of each year from 2005 through 2021, to

11

"determine and publish in the Federal Register" by November 30 of each year the renewable fuel obligations for the upcoming year. *Id.* §§ 7545(o)(3)(A)–(B).  The EPA expresses these obligations in terms of a "volume percentage" of transportation fuel sold or introduced into commerce in the United States.  *Id.* §§ 7545(o)(3)(B)(ii)(I)–(III).  As discussed in more detail below, this process involves transforming aggregate volumes from the EIA into individual compliance obligations.  The EPA estimates what percentage of the overall fuel supply each of the four renewable fuel types specified in the statute should constitute, and requires designated entities to replicate those percentages on an individual basis.  The law states that yearly renewable fuel obligations are "applicable to refineries, blenders, and importers, as appropriate[.]"  *Id.* § 7545(o)(3)(B)(ii).

The Energy Independence and Security Act continued the credit program established by the Energy Policy Act.  The current version of the statute envisions the generation of credits for refined, blended, or imported gasoline with greater-than-required quantities of renewable fuel; for the use or transfer to another person of such credits; and for carrying forward a renewable fuel deficit in certain circumstances (a deficit that must be addressed "in the calendar year following the year in which the renewable fuel deficit is created").  *Id.* §§ 7545(o)(5)(A)–(B), (D).  The law states that a credit "shall be valid to show compliance for the 12 months as of the date of generation."  *Id.* § 7545(o)(5)(C).

The Energy Independence and Security Act also continued to make available a small refinery exemption.  The definition of "small refinery" still looks to whether a

12

refinery has average aggregate daily crude oil throughput for a calendar year of 75,000 barrels or less. 42 U.S.C. § 7545(o)(1)(K). The "Temporary exemption" was again written to apply to small refineries until 2011, with a minimum extension of the exemption of two years for any such refinery determined to be subject to a disproportionate economic hardship by a DOE study to be conducted no later than 2008. *Id.* §§ 7505(o)(9)(A)(i)–(ii). Small refineries continue to be able to petition the EPA "at any time" for an extension of this exemption. *Id.* § 7545(o)(9)(B)(i). The EPA is obligated to "make adjustments" when determining the renewable fuel volume percentages for an upcoming calendar year to "account for the use of renewable fuel during the previous calendar year by small refineries that are exempt[.]" *Id.* § 7545(o)(3)(C)(ii).

Several supporters of the Energy Independence and Security Act in the Senate highlighted that the bill substantially increased renewable fuel requirements to promote energy independence and environmental stewardship. In the words of one legislator:

> To help reduce our dependence on imported oil, and on oil consumption, this bill strengthens the renewable fuels standard. It sets clear benchmarks for higher levels of production of biofuels made from corn as well as other feedstocks, including soybean oil, switchgrass, and other sources of energy that will be developed in the future. With this bill we will shift some of our energy reliance from the oilfields of the Middle East to the corn fields of the Midwest. The bill will ratchet up the schedule for the use of renewable fuels in our cars and trucks from the level of 7.5 billion gallons by 2012, as passed in the 2005 Energy Bill, to 15 billion gallons by 2015 and 36 billion gallons by 2022. That represents a major advance in our commitment to renewable, home grown fuels that reduce emissions, mitigate global warming, and improve farmer income.

13

153 Cong. Rec. S15421, S15429 (daily ed. Dec. 13, 2007) (statement of Sen. Durbin); *see also id.* at S15428 (statement of Sen. Johnson) (commenting that "[t]his bipartisan bill builds on the success of the Energy Policy Act of 2005, which authorized the first nationwide renewable fuel standard, RFS," that the bill will ramp up "the amount of ethanol and cellulosic ethanol produced in this country so that by 2020 the United States will produce a minimum of 36 billion gallons of renewable fuels," and that "[w]e are going to produce more fuel from renewable resources and over the long-term decrease the amount of fossil fuels we need to import from unstable regions of the globe"); *id.* (statement of Sen. Cardin) ("H.R. 6 raises the annual requirement for the amount of renewable fuels used in cars and trucks to 36 billion gallons by 2022. H.R. 6 makes a historic commitment to develop cellulosic ethanol by requiring that the United States produce 21 billion gallons of advanced biofuels, like cellulosic ethanol. Homegrown renewable fuels will replace the equivalent of all the oil we import from the Middle East today."); 153 Cong. Rec. S15004, S15008 (daily ed. Dec. 7, 2007) (statement of Sen. Reid) ("This legislation makes an unprecedented commitment to American-grown biofuels by increasing the renewable fuels standard to 36 billion gallons by the year 2022, which will not just reduce our addiction to oil but create American jobs as well.").

Certain members of the House of Representatives likewise embraced the view that the substantial increase in renewable fuel utilization envisioned by the Energy Independence and Security Act would produce geopolitical and environmental

14

benefits. 153 Cong. Rec. H16659, H16744–45 (daily ed. Dec. 18, 2007) (statement of Rep. Jackson-Lee) ("[T]ransitioning from foreign oil to ethanol will protect our environment from dangerous carbon and greenhouse gas emissions. With its commitment to American biofuels, the legislation calls for a significant increase in the Renewable Fuels Standard. It encourages the diversification of American energy crops thus ensuring that biodiesel and cellulosic sources are key components in America's drive to become energy independent."); *id.* at H16749 (statement of Rep. Udall) ("And it will increase the Renewable Fuels Standard (RFS), which sets annual requirements for the amount of renewable fuels produced and used in motor vehicles. The new RFS has specific requirements for the use of biodiesel and cellulosic sources to ensure that these ethanol sources also advance along with corn-based ethanol. Furthermore, the bill includes critical environmental safeguards to ensure that the growth of homegrown fuels helps to reduce carbon emissions."); 153 Cong. Rec. H14434, H14437 (daily ed. Dec. 6, 2007) (statement of Rep. Conyers) ("The legislation before us today also reduces our dependence on foreign oil. The initiative includes a historic commitment to American biofuels that will fuel our cars and trucks."); *id.* at H14439 (statement of Rep. Engel) (stating that the legislation makes "an historic commitment to American grown biofuels," including an RFS "which will ensure that a percentage of our nation's fuel supply will be provided by the domestic production of biofuels," providing a pathway "for reduced consumer fuel prices, increased energy security, and growth in our nation's factories and farms").

15

The substantial increase in renewable fuel targets in the Energy Independence and Security Act also prompted some objections to the legislation. *See, e.g.,* 153 Cong. Rec. E2589, E2589–90 (daily ed. Dec. 17, 2007) (statement of Rep. Herger) ("H.R. 6 seeks to raise the current ethanol requirement by a factor of five. Such a dramatic increase, combined with growing demand for corn-fed meat products the world over, will likely result in even higher food prices for U.S. consumers."); 153 Cong. Rec. S15421, S15422–23 (daily ed. Dec. 13, 2007) (statement of Sen. Inhofe) ("The renewable fuels standard increase is going to mandate an increase from 7 ½ to 15. That is of corn ethanol. Then other bio increases are more than that. . . . [T]he livestock and the poultry people . . . are very distressed because of the increase in the cost of feedstock. This is going to make it that much worse. There are other problems with that too, with ethanol's effect on food prices: economic sustainability, transportation infrastructure needs, the water usage in that process."); 153 Cong. Rec. H14434, 14441 (daily ed. Dec. 6, 2007) (statement of Rep. Goodlatte) ("This legislation would dramatically expand the Renewable Fuels Standard (RFS) by increasing it to 36 billion gallons by 2022. This initiative is extremely ambitious . . . . The RFS provisions create an unrealistic mandate for advanced biofuels technology that doesn't yet exist and creates hurdles for the development of second generation biofuels . . . .").

The objections did not carry the day, and President George W. Bush signed the Energy Independence and Security Act into law. The President noted that when he endorsed the Energy Policy Act two years earlier, he understood "we needed to go

16

even further." Statement by President George W. Bush Upon Signing H.R. 6 (Dec. 19, 2007), *reprinted in* 2007 U.S.C.C.A.N. S25. He said the Energy Independence and Security Act was "a major step toward reducing our dependence on oil, confronting global climate change, expanding the production of renewable fuels and giving future generations of our country a nation that is stronger, cleaner and more secure." *Id.* He declared that "[t]he bill I sign today takes a significant step because it will require fuel producers to use at least 36 billion gallons of biofuel in 2022. This is nearly a fivefold increase over current levels. It will help us diversify our energy supplies and reduce our dependence on oil. It's an important part of this legislation, and I thank the members of Congress for your wisdom." *Id.* at S26.

B.    REGULATIONS AND POST-ENACTMENT HISTORY

The EPA has issued a number of regulations to implement the renewable fuels program. Although the statute refers to "refineries, blenders, and importers" in connection with yearly percentage volume requirements, 42 U.S.C. § 7545(o)(3)(B)(ii), the EPA confines "obligated parties" to refiners and importers. 40 C.F.R. § 80.1406(a)(1). The EPA has published the equations used to calculate the annual renewable fuel percentage standards, *id.* § 80.1405(c), along with the formulas used to determine individual Renewable Volume Obligations ("RVOs") as to the four categories of renewable fuels. *Id.* § 80.1407(a). In general, an RVO for an obligated party is determined by applying an annual percentage requirement to the amount of non-renewable fuel produced or imported by that party, and then adding any deficit carryover from the previous year. *Id.*

17

The EPA administers credits using a device known as a Renewable Identification Number ("RIN"). *Id.* § 80.1401. The regulations describe how RINs are generated and assigned to batches of renewable fuel by producers and importers. *Id.* § 80.1426. Each party required to meet an RVO must demonstrate that it has "retired for compliance purposes" a sufficient number of RINs. *Id.* § 80.1427(a)(1). This involves "separating" RINs by blending the renewable fuel with petroleum-based fuel, *id.* § 80.1429, at which point the RINs may be "transferred any number of times." *Id.* § 80.1428(b)(3). RINs created by blending or purchase typically may only be used to demonstrate compliance "for the calendar year in which they were generated or the following calendar year." *Id.* § 80.1427(a)(6)(i). RINs used to show compliance in one year usually "cannot be used to demonstrate compliance in any other year." *Id.* § 80.1427(a)(6)(ii). A RIN is considered "expired" if not used during the year of its creation or the year after, and "an expired RIN will be considered an invalid RIN and cannot be used for compliance purposes." *Id.* § 80.1428(c).

The EPA has regulations pertaining to the small refinery exemption as well. The regulations recognized an exemption in 2010 for each entity that met "the definition of small refinery" for "calendar year 2006." *Id.* § 80.1441(a)(1). The regulations stated that this exemption "shall be extended" for at least two years if a DOE study determined compliance would impose disproportionate economic hardship. *Id.* § 80.1441(e)(1). The regulations indicate that a small refinery may petition for "an extension" of the exemption "at any time," and that such a petition

18

must "specify the factors that demonstrate a disproportionate economic hardship;" provide a detailed discussion regarding "the hardship the refinery would face in producing" compliant transportation fuel; and identify "the date the refiner anticipates that compliance with the requirements can reasonably be achieved[.]" *Id.* § 80.1441(e)(2)(i). In 2014, the EPA amended the regulations to change the definition of a small refinery (the "2014 Small Refinery Rule"):

> In order to qualify for an extension of its small refinery exemption, a refinery must meet the definition of "small refinery" in § 80.1401 for the most recent full calendar year prior to seeking an extension and must be projected to meet the definition of "small refinery" in § 80.1401 for the year or years for which an exemption is sought. Failure to meet the definition of small refinery for any calendar year for which an exemption was granted would invalidate the exemption for that calendar year.

*Id.* § 80.1441(e)(2)(iii).

At least since 2010, *see id.* § 80.1405(a), the EPA has published lengthy documents setting yearly renewable fuel standards and explaining how the program works. These documents acknowledge that the program originated with the Energy Policy Act and was modified by the Energy Independence and Security Act. *E.g.,* Renewable Fuel Standard Program: Standards for 2018 and Biomass-Based Diesel Volume for 2019 ("EPA 2018 Standards"), 82 Fed. Reg. 58,486, 58,487 (Dec. 12, 2017). They also acknowledge that the stated goals of the Energy Independence and Security Act included moving the country toward "greater energy independence and security [and] to increase the production of clean renewable fuels." *Id.* (brackets in original). "The fundamental objective of the RFS provisions under the CAA is clear:

19

To increase the use of renewable fuels in the U.S. transportation system every year through at least 2022 in order to reduce greenhouse gases (GHGs) and increase energy security." Renewable Fuel Standard Program: Standards for 2014, 2015 and 2016 and Biomass-Based Diesel Volume for 2017 ("EPA 2014-2016 Standards"), 80 Fed. Reg. 77,420, 77,421 (Dec. 14, 2015).

The EPA in recent years has announced volume requirements that are "lower than the statutory targets," but the agency contends these targets "nevertheless will ensure these renewable fuels will continue to play a critical role as a complement to our petroleum-based fuels." EPA 2018 Standards, 82 Fed. Reg. at 58,487. Starting no later than 2015, for instance, the EPA indicated that "challenges have made the volume targets established by Congress for 2014, 2015, and 2016 beyond reach." EPA 2014-2016 Standards, 80 Fed. Reg. at 77,422. The EPA thus decided to apply "the tools Congress provided to make adjustments to the statutory volume targets in recognition of the constraints that exist today,"[2] while at the same time retaining standards sufficient to "drive growth in renewable fuels, particularly advanced biofuels which achieve the lowest lifecycle GHG emissions." *Id.* at 77,423; *see also* Renewable Fuel Standard Program: Standards for 2017 and Biomass-Based Diesel

---

[2] The statute contains several qualifications and waiver provisions. *See, e.g.,* 42 U.S.C. § 7545(o)(2)(B)(ii) (describing factors to be analyzed when setting renewable fuel volumes); *id.* § 7545(o)(4) (identifying circumstances where greenhouse gas reduction percentages may be adjusted); *id.* §§ 7545(o)(7)(A)–(C), (F) (allowing waivers based on severe harm to the economy or environment, or on inadequate domestic supply); *id.* §§ 7545(o)(7)(D)–(E) (setting forth conditions under which volumes of cellulosic biofuel and biomass-based diesel must or may be reduced).

Volume for 2018, 81 Fed. Reg. 89,746, 89,747 (Dec. 12, 2016) ("The standards we are setting are designed to achieve the Congressional intent of increasing renewable fuel use over time in order to reduce lifecycle GHG emissions of transportation fuels and increase energy security, while at the same time accounting for real-world challenges that have slowed progress toward these goals.").

The EPA's stated aim in harmonizing real-world constraints with aggressive statutory renewable fuel targets is to maintain the RFS program "as a market forcing policy." EPA 2014-2016 Standards, 80 Fed. Reg. at 77,423. In the EPA's words, "[t]he objective of the program is to introduce increasing volumes of renewable fuels, with a focus on cellulosic and other advanced renewable fuels, into the marketplace. Congress made the decision that this is an appropriate policy objective, and put in place a program to achieve that policy goal." *Id.*; *see also id.* ("The fact that Congress chose to mandate increasing and substantial amounts of renewable fuel clearly signals that it intended the RFS program to create incentives to increase renewable fuel supplies and overcome constraints in the market."). The EPA has observed that (1) "Congress set targets that envisioned growth at a pace that far exceeded historical growth and prioritized that growth as occurring principally in advanced biofuels;" and (2) "[i]t is apparent, therefore, that Congress intended changes to the extent and pace of growth of renewable fuel use that would be unlikely to occur absent the new program." *Id.* at 77,432.

The EPA has also reviewed how overall targets are translated into individual compliance requirements for obligated parties. According to the EPA:

21

Under the RFS program, EPA is required to determine and publish annual percentage standards for each compliance year. The percentage standards are calculated to ensure use in transportation fuel of the national "applicable volumes" of the four types of biofuels (cellulosic biofuel, BBD, advanced biofuel, and total renewable fuel) that are set forth in the statute or established by EPA in accordance with the Act's requirements. The percentage standards are used by obligated parties (generally, producers and importers of gasoline and diesel fuel) to calculate their individual compliance obligations. Each of the four percentage standards is applied to the volume of non-renewable gasoline and diesel that each obligated party produces or imports during the specified calendar year to determine their individual volume obligations with respect to the four renewable fuel types. The individual volume obligations determine the number of Renewable Identification Numbers (RINs) of each renewable fuel type that each obligated party must acquire and retire to demonstrate compliance.

EPA 2018 Standards, 82 Fed. Reg. at 58,488. The EPA maintains that "[t]he percentage standards are set so that if every obligated party meets the percentages by acquiring and retiring the appropriate number of RINs, then the amount of renewable fuel, cellulosic biofuel, BBD, and advanced biofuel used will meet the applicable volume requirements on a nationwide basis." *Id.* at 58,522.

As to small refineries, the EPA's standard-setting documents confirm that "Congress provided a temporary exemption" which could be extended beyond 2010 "based either on the results of a required DOE study, or based on an EPA determination of 'disproportionate economic hardship' on a case-by-case basis in response to small refinery petitions." EPA 2018 Standards, 82 Fed. Reg. at 58,523; *see also* Regulation of Fuels and Fuel Additives: 2013 Renewable Fuel Standards ("EPA 2013 Standards"), 78 Fed. Reg. 49,794, 49,821 (Aug. 15, 2013) ("Congress provided two ways that small refineries can receive a temporary extension of the

22

exemption beyond 2010."). As stated by the EPA, Congress "spoke directly to the relief that EPA may provide for small refineries," and "limited that relief to a blanket exemption through December 31, 2010, with additional extensions if the criteria specified by Congress are met." Regulation of Fuels and Fuel Additives: Changes to Renewable Fuel Standard Program, 75 Fed. Reg. 14,670, 14,736 (Mar. 26, 2010).

The DOE issued a small refinery study in 2009. The study "did not find that small refineries would face a disproportionate economic hardship under the RFS program." Regulation of Fuels and Fuel Additives: 2012 Renewable Fuel Standards ("EPA 2012 Standards"), 77 Fed. Reg. 1,320, 1,339 (Jan. 9, 2012) (footnote omitted). The EPA understood that the conclusions of the 2009 DOE study "were based in part on the expected robust availability of RINs and EPA's ability to grant relief on a case-by-case basis." *Id.* at 1,339–40. The EPA explained that as a result of the 2009 study, "beginning in 2011 small refiners and small refineries were required to participate in the RFS program as obligated parties," and "there was no small refiner/refinery volume adjustment to the 2011 standard as there was for the 2010 standard." *Id.* at 1,340.

A report from the Senate Committee on Appropriations criticized the DOE's 2009 study. The report stated that "[t]he Committee understands the study contained inadequate small refinery input, did not assess the economic condition of the small refining sector, take into account regional factors or accurately project RFS compliance costs." S. Rep. No. 111-45, at 109 (2009). The Committee generally directed the DOE to "reopen and reassess the Small Refineries Exemption Study,"

23

and specifically directed the DOE to "seek and invite comment from small refineries on the RFS exemption hardship question, assess RFS compliance impacts on small refinery utilization rates and profitability, evaluate the financial health and ability of small refineries to meet RFS requirements, study small refinery impacts and regional dynamics by [Petroleum Administration for Defense District, or] PADD, and reassess the accuracy of small refinery compliance costs through the purchase of renewable fuel credits." *Id.* (brackets added). A House conference report added that "[t]he conferees support the study requested by the Senate on RFS and expect the Department to undertake the requested economic review." H.R. Rep. No. 111-278, at 126 (2009).

The DOE issued a revised small refinery study in 2011. The EPA in 2012 wrote that "DOE recently re-evaluated the impacts of the RFS program on small entities and concluded that 21 small refineries would suffer a disproportionate hardship if required to participate in the program. As a result, these refineries will be exempt from being obligated parties for a minimum of two additional years, 2011 and 2012." EPA 2012 Standards, 77 Fed. Reg. at 49,821 (footnotes omitted). The EPA currently says on its website that "[f]or 2011 and 2012, 24 small refineries were granted an exemption" under 42 U.S.C. § 7545(o)(9)(A)(ii). *See* RFS Small Refinery Exemptions, https://www.epa.gov/fuels-registration-reporting-and-compliance-help/rfs-small-refinery-exemptions ("Small Refinery Exemptions, EPA Website," last visited January 17, 2020). The EPA cites the 2019 data from this website with approval in its appellate brief. EPA Respondent's Br. at 12 n.1.

As directed, one of the steps the DOE took to revisit the issue of disproportionate economic hardship was to survey small refineries. Small Refinery Exemption Study: An Investigation into Disproportionate Economic Hardship ("2011 DOE Study"), U.S. Department of Energy (Mar. 2011, redacted), Administrative Record volume 1 ("REC1") at 483, 489–90. With those survey results in hand, the DOE concluded that "[d]isproportionate economic hardship must encompass two broad components: a high cost of compliance relative to the industry average, and an effect sufficient to cause a significant impairment of the refinery operations." *Id.* at 495. The DOE created scoring matrixes to reflect these two categories. *Id.* at 495, 523–28. The first matrix contains scoring for "Disproportionate Structural Impact Metrics" (with categories for access to capital/credit, other business lines besides refining and marketing, local market acceptance of renewables, percentage of diesel production, and exceptional state regulations) and "Disproportionate Economic Impact Metrics" (with categories for relative refining margin measure, renewable fuel blending as a percentage of production, operation in a niche market, and RINs net revenue or cost). *Id.* at 525–27. The second matrix contains scoring for "Viability Metrics" (with categories for compliance costs eliminating efficiency gains, individual special events, and compliance costs being likely to lead to a shutdown). *Id.* at 528; *see also* Addendum to the Small Refinery Exemption Study: An Investigation into Disproportionate Economic Hardship, U.S. Department of Energy (May 2014), REC1 at 583–85 (explaining scoring changes with respect to the viability matrix).

25

In late 2015, Congress provided an explanatory statement on the 2016 Consolidated Appropriations Act concerning the DOE's scoring system. Noting that the DOE's 2011 study set forth "two broad components" for disproportionate economic hardship – "a high cost of compliance relative to the industry average disproportionate impacts" and "an effect sufficient to cause significant impairment of the refinery operations viability" – the explanatory statement provided that if the Secretary of Energy "finds that either of these two components exists, the Secretary is directed to recommend to the EPA Administrator a 50 percent waiver of RFS requirements for the petitioner." 161 Cong. Rec. H9693, H10105 (daily ed. Dec. 17, 2015). The explanatory statement further provided that a small refinery with profits sufficient to cover RFS compliance costs might nonetheless be subject to a disproportionate economic hardship:

> [T]he dramatic rise in RIN prices has amplified RFS compliance and competitive disparities, especially where unique regional factors exist, including high diesel demand, no export access, and limited biodiesel infrastructure and production. In response to recent petitions, the Secretary determined that the RFS program would impose a disproportionate economic and structural impact on several small refineries. Despite this determination, the Secretary did not recommend, and EPA did not provide, any RFS relief because it determined the refineries were profitable enough to afford the cost of RFS compliance without substantially impacting their viability. The Secretary is reminded that the RFS program may impose a disproportionate economic hardship on a small refinery even if the refinery makes enough profit to cover the cost of complying with the program. Small refinery profitability does not justify a disproportionate regulatory burden where Congress has explicitly given EPA authority, in consultation with the Secretary, to reduce or eliminate this burden.

*Id.*

26

A 2016 Senate report on appropriations for various agencies contained similar observations. The Senate report commented that "[i]n response to several recent petitions," the EPA had "determined that compliance with the RFS would have a disproportionate economic impact on a small refinery, but denied hardship relief because the small refinery remained profitable notwithstanding the disproportionate economic impact." S. Rep. No. 114-281, at 70 (2016). The report indicated that "[t]his is inconsistent with congressional intent because the statute does not contemplate that a small refinery would only be able to obtain an exemption by showing that the RFS program threatens its viability. Congress explicitly authorized the Agency to grant small refinery hardship relief to ensure that small refineries remain both competitive and profitable." *Id.*; *see also id.* (intimating that "small entities cannot remain competitive and profitable if they face disproportionate structural or economic metrics such as limitations on access to capital, lack of other business lines, disproportionate production of diesel fuel, or other site specific factors"). In a separate explanatory statement on an agreement regarding appropriations amendments, the House echoed that "[t]he agreement includes the directive contained in Senate Report 114-281 related to small refinery relief." 163 Cong. Rec. H3327, H3884 (daily ed. May 3, 2017) (statement of Rep. Frelinghuysen).

Beginning in 2016, the EPA began granting more petitions to extend the small refinery exemption. Table 2 on the EPA's website indicates that while the agency granted 23 of 41 extension petitions from 2013-2015 (reflecting an approval rate of

27

approximately 56%, as two petitions were declared ineligible or withdrawn), the agency granted 85 of 94 extension petitions from 2016-2018 (reflecting an approval rate of approximately 90%, as five petitions were declared ineligible or withdrawn):

| Compliance Year | Number of Petitions Received | Number of Grants Issued | Number of Denials Issued | Number of Petitions Declared Ineligible | Number of Petitions Withdrawn | Number of Pending Petitions |
|---|---|---|---|---|---|---|
| 2013 | 16 | 8 | 7 | 0 | 1 | 0 |
| 2014 | 13 | 8 | 5 | 0 | 0 | 0 |
| 2015 | 14 | 7 | 6 | 1 | 0 | 0 |
| 2016 | 20 | 19 | 1 | 0 | 0 | 0 |
| 2017 | 37 | 35 | 1 | 0 | 1 | 0 |
| 2018 | 42 | 31 | 6 | 2 | 3 | 0 |
| 2019 | 21 | 0 | 0 | 0 | 0 | 21 |

Small Refinery Exemptions, EPA Website (data as of January 16, 2020); *see also* Renewable Fuel Standard Program: Standards for 2019 and Biomass-Based Diesel Volume for 2020 ("EPA 2019 Standards"), 83 Fed. Reg. 63,704, 63,707 (Dec. 11, 2018) (stating that in response to comments suggesting increased disclosure of "data related to the RIN market," the EPA "made additional information available through our public website," including "the number of small refinery exemption petitions received, granted, and denied by year"). The EPA granted 19 of 20 small refinery extension petitions in 2016, 35 of 36 eligible and maintained petitions in 2017, and 31 of 37 eligible and maintained petitions in 2018. Small Refinery Exemptions, EPA Website.

As the number of granted petitions began to rise, so too did the amount of fuel exempted from the amended Clean Air Act's renewable fuels targets. Table 1 on the

28

EPA's website reveals not only that exempted volumes of gasoline and diesel went from approximately 2 billion gallons in 2013 to a peak of 17 billion gallons in 2017 (with more than 13 billion exempted gallons in 2018), but also that exempted RVOs went from approximately 190 million RINs in 2013 to an apex of 1.8 billion RINs in 2017 (with more than 1.4 billion exempted RINs in 2018):

| Compliance Year | Estimated Volumes of Gasoline and Diesel Exempted (million gallons) | Estimated Renewable Volume Obligations (RVO) Exempted (million RINs) |
| --- | --- | --- |
| 2013 | 1,980 | 190 |
| 2014 | 2,300 | 210 |
| 2015 | 3,070 | 290 |
| 2016 | 7,840 | 790 |
| 2017 | 17,050 | 1,820 |
| 2018 | 13,420 | 1,430 |
| 2019 | 0 | 0 |

*Id.* (rounded to the nearest 10 million gallons or RINs).

If any small refinery petitions to extend the temporary exemption are granted after the announcement of the applicable percentage standards for a given year, the EPA does not modify the standards to account for the exemptions. The EPA has followed this policy at least from 2011 through 2018, reasoning that "the Act is best interpreted to require issuance of a single annual standard in November that is applicable in the following calendar year, thereby providing advance notice and certainty to obligated parties regarding their regulatory requirements." Regulation of Fuels and Fuel Additives: 2011 Renewable Fuel Standards ("EPA 2011 Standards"), 75 Fed. Reg. 76,790, 76,804 (Dec. 9, 2010). The EPA says that "[p]eriodic revisions to the standards to reflect waivers issued to small refineries or refiners would be

inconsistent with the statutory text, and would introduce an undesirable level of uncertainty for obligated parties." *Id.*; *see also* EPA 2018 Standards, 82 Fed. Reg. at 58,523 ("EPA is maintaining its approach that any exemptions for 2018 that are granted after the final rule is released will not be reflected in the percentage standards that apply to all gasoline and diesel produced or imported in 2018."). The EPA recognizes that "any exemption for a small refinery will result in a proportionally higher percentage standard for remaining obligated parties," and that "this will affect the degree to which individual obligated parties can acquire sufficient RINs for compliance through blending ethanol into gasoline that they produce." EPA 2011 Standards, 75 Fed. Reg. at 76,805.

## C.    THE EXEMPTION EXTENSION PETITIONS

The EPA is required to consider DOE studies and other economic factors when assessing small refinery petitions. 42 U.S.C. § 7545(o)(9)(B)(ii). Operating within this framework, the EPA received and evaluated the three extension petitions at issue in this case. HollyFrontier Cheyenne Refining LLC ("Cheyenne") submitted a petition in March 2017. Administrative Record volume 2 ("REC2") at 589–610. HollyFrontier Woods Cross Refining LLC ("Woods Cross") submitted a petition in September 2017. *Id.* at 648–63. Wynnewood Refining Company, LLC ("Wynnewood") submitted a petition in January 2018. *Id.* at 686–731. The petitions for these three refineries ("the Refineries") are discussed in more detail below.

As a prelude, we describe how information identified by the parties as confidential has been handled. As noted *infra* in § II, the Refineries requested

confidentiality when they submitted their extension petitions to the EPA. The parties continued on appeal to seek confidential treatment of certain business information. In a series of orders, this court provisionally granted the parties' request for a protective order, along with the parties' requests to file particular briefs and record materials under seal. In each of those orders, the court explained that it retained discretion to revisit the issues. At the court's prompting, the Refineries later indicated whether they objected to the disclosure of several specific facts.

The court is honoring most – but not all – of the Refineries' confidentiality objections. The court is also maintaining the confidential status of any previously-sealed document. The court has kept in mind 5 U.S.C. § 552(b)(4), which contains a disclosure exemption for privileged or confidential "trade secrets and commercial or financial information," as well as 40 C.F.R. § 2.208, which states that "business information is entitled to confidential treatment" if various requirements are met. Any instance in this opinion in which the court parts company with the parties on confidentiality is based both on these standards and on the "strong presumption" under the common law "in favor of public access." *United States v. Pickard*, 733 F.3d 1297, 1302 (10th Cir. 2013) (citation omitted); *see also Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1241 (10th Cir. 2012) (commenting that this presumption "may be overcome where countervailing interests heavily outweigh the public interests in access") (citation and internal quotation marks omitted).

1. CHEYENNE

According to the petition submitted on behalf of Cheyenne in 2017, the refinery employs approximately 300 people in Wyoming. REC2 at 590. Because it was identified in the DOE's 2011 study as being subject to disproportionate economic hardship, Cheyenne was granted an extension of the small refinery exemption through 2012. *Id.* Cheyenne did not apply for or did not receive an extension of the exemption in 2013 and 2014. *Id.* at 638 n.13. Cheyenne applied to extend the exemption in 2015, but the EPA denied the petition. *Id.* at 590, 638 n.13. On appeal, this court granted an unopposed motion by the EPA to vacate the denial and remand the matter to the agency for further proceedings consistent with *Sinclair Wyo. Refining Co. v. EPA*, 874 F.3d 1159 (10th Cir. 2017). The parties have not discussed the subsequent proceedings, but we assume for purposes of this opinion that Cheyenne's 2015 petition was granted on remand. *See infra* § II (summarizing post-*Sinclair* events in the context of redressability).

Cheyenne contended in its 2017 petition that renewable fuel compliance in 2016 would impose disproportionate economic hardship. Cheyenne emphasized that it focused on diesel (normally blended with less renewable fuel than gasoline) and otherwise had limited blending abilities, in contrast to some "larger, more competitive refineries." REC2 at 592–93. Cheyenne argued that "[t]he cost of RIN purchases and the poor economics of biodiesel blending threaten the viability of the Cheyenne refinery[.]" *Id.* at 593. Cheyenne described the expenses it believed would arise out of RFS compliance in 2016, consisting of blending costs and RIN

32

purchase costs.  *Id.* at 593, 596.  Cheyenne averred that it had no other business lines besides refining and marketing, that it had an operating loss and an asset impairment in 2016, that it had relatively thin margins over the past three years, and that it did not operate in a niche market.  *Id.* at 595–97.

The DOE applied its scoring criteria and recommended denying Cheyenne's request for an extension of the small refinery exemption in 2016.  *Id.* at 627–28.  The DOE gave Cheyenne "a score of 0.9 in the structural and economic metric and a score of 0.0 in the viability metric."  *Id.* at 628.  The DOE concluded that "the HollyFrontier Cheyenne refinery had positive refining margins and RFS compliance would not appear, based on the data we analyzed, to threaten the refinery's economic viability."  *Id.*

The EPA declined to follow the DOE's recommendation and granted Cheyenne's petition.  *Id.* at 614, 629–46.  The EPA acknowledged that "it has been found that a refinery does <u>not</u> experience disproportionate economic hardship simply because it may need to purchase a significant percentage of its RINs for compliance from other parties, even though RIN prices have increased since the DOE study, because the RIN prices lead to higher sales prices obtained for the refineries' blendstock, resulting in no net cost of compliance for the refinery."  *Id.* at 634 n.5 (emphasis in original).  The EPA also acknowledged that the DOE did not find "disproportionate economic and structural impacts and the Cheyenne Refinery."  *Id.* at 645.  After summarizing Cheyenne's financial history, however, *id.* at 637–42, the EPA determined that the refinery "would suffer a disproportionate economic hardship

if it had to comply with the RFS obligations for 2016 and should be granted full relief." *Id.* at 646.

In granting the petition, the EPA reasoned that "for a refinery like the Cheyenne Refinery, its disproportionate economic hardship may be the result of other economic factors, including a difficult year for the industry as a whole." *Id.* at 645. The EPA found that Cheyenne's financial performance showed the refinery would disproportionately suffer "from compliance with RFS obligations." *Id.* The EPA discussed Cheyenne's financial performance in 2016, Cheyenne's cash flow from 2014-2016, Cheyenne's net refining margin in 2016, and Cheyenne's three-year average net refining margin. *Id.* at 640, 645.

In the process of adjudicating Cheyenne's petition, the EPA acknowledged it was generally altering its methodology. The agency stated "[i]n prior decisions, EPA considered that a small refinery could not show disproportionate economic hardship without showing an effect on 'viability,' but we are changing our approach." *Id.* at 636 n.10. The agency explained that "[w]hile a showing of a significant impairment of refinery operations may help establish disproportionate economic hardship, compliance with RFS obligations may impose a disproportionate economic hardship when it is disproportionately difficult for a refinery to comply with its RFS obligations – even if the refinery's operations are not significantly impaired." *Id.* at 636 n.10, 646 n.41.

34

## 2.    WOODS CROSS

The 2017 petition submitted on behalf of Woods Cross stated that the refinery has 285 employees and 70 full-time contractors in Utah. *Id.* at 648–49. The petition asserted neither that Woods Cross was identified as being subject to disproportionate economic hardship in the DOE's 2011 study, nor that Woods Cross previously sought or received other extensions of the small refinery exemption. *Id.* at 648–53. Woods Cross declared that compliance with RFS in 2016 would impose disproportionate economic hardship because the refinery has no other lines of business and cannot blend the full amount of required renewable fuel, because "there is still some resistance to the acceptance of biodiesel" in Woods Cross's market, and because buying RINs "adds a heavy financial burden to the refinery and renders it economically inefficient relative to its competition." *Id.* at 649–52. Woods Cross described what it believed its compliance costs for 2016 would be, tallying up RIN purchases and blending costs. *Id.* at 652.

The DOE recommended granting Woods Cross's petition in part. *Id.* at 678–79. The DOE gave Woods Cross "a score of 1.9 in the structural and economic metric and a score of 0.0 in the viability metric." *Id.* at 679. The DOE found that Woods Cross "did not have negative refining margins while making significant refinery investments, thus RFS compliance would not appear, based on the data we analyzed, to threaten the refinery's economic viability." *Id.* Because Woods Cross scored above 1.0 in the first metric, the DOE suggested that EPA consider a "50 percent exemption from the 2016 RFS[.]" *Id.*

The EPA granted Woods Cross's petition and awarded a full extension of the small refinery exemption, rather than a partial extension of the exemption. *Id.* at 665, 680–85. The EPA noted this court held in *Sinclair* that the agency's previous viability requirement for "disproportionate economic hardship" was "at odds with Congress's statutory command." *Id.* at 681–82 (citation omitted); *see also Sinclair*, 887 F.3d at 988 ("[T]he EPA has exceeded its statutory authority under the CAA in interpreting the hardship exemption to require a threat to a refinery's survival as an ongoing operation."). The agency recounted, however, that "prior to this ruling, EPA had already changed its approach for the 2016 small refinery petitions issued in May 2017." REC2 at 682. The agency clarified that it had determined disproportionate economic hardship "can exist on the basis of adverse structural conditions alone. A difficult year for the refining industry as a whole may exacerbate economic problems for small refineries that face disproportionate impacts." *Id.*; *see also id.* (stating that the "industry-wide downward trend" of lower net refining margins "can result in tangible effects on small refineries with adverse structural conditions").

The EPA concluded that in combination with other factors, unfavorable structural conditions for Woods Cross warranted "100% relief." *Id.* at 682, 684. The EPA drew attention to limitations on the refinery's blending capabilities, and addressed Woods Cross's net refining margins and financial performance in 2015 and 2016. *Id.* at 684. This analysis led the EPA to decide that "the Woods Cross Refinery will experience [disproportionate economic hardship] that can be relieved in whole or in part by removing its RFS obligations for 2016." *Id.* (brackets added).

36

3. WYNNEWOOD

The petition submitted on behalf of Wynnewood in 2018 described that refinery as having more than 300 employees and more than 250 full-time contractors in Oklahoma. *Id.* at 688. The petition stated that Wynnewood received an extension of the blanket exemption in 2011 and 2012, but "has not received hardship relief since 2012." *Id.* at 687. Wynnewood described what it believed RFS compliance costs would be, and compared those costs to the refinery's other operating expenses. *Id.* at 688–89, 694. In light of the refinery's financial performance in 2017, Wynnewood claimed the RFS compliance costs would impose disproportionate economic hardship. *Id.* at 689.

The Wynnewood petition addressed all of the factors in the DOE's scoring matrixes. As to structural and economic factors, Wynnewood presented arguments concerning (1) access to capital or credit; (2) other lines of business; (3) the market for the relevant blended renewable fuels; (4) the refinery's proportion of diesel fuel; (5) the refinery's net refining margins in 2015 and 2016, along with a three-year average margin; (6) the presence or absence of a niche market; and (7) the possibility of "passing through" RIN expenses to customers. *Id.* at 689–96. As to viability, Wynnewood again referenced the metric of average net refining margin, and gave the EPA an assessment of competitiveness and profitability. *Id.* at 696.

Similar to Woods Cross, the DOE recommended "a 50 percent exemption from the 2017 RFS" for Wynnewood. *Id.* at 736. The DOE scored Wynnewood on structural, economic, and viability metrics. *Id.* The DOE stated that "the refinery

37

has positive refining margins and RFS compliance would not appear, based on the data we analyzed, to threaten the refinery's economic viability." *Id.* Nonetheless, based on structural and economic factors, the DOE suggested that the EPA grant a partial extension of the small refinery exemption. *Id.*

The EPA granted Wynnewood's petition and fully extended the exemption for 2017. *Id.* at 733, 737–41. The EPA explained that "[i]n previous year decisions, DOE and EPA considered that [disproportionate economic hardship] exists only when a refinery experiences both disproportionate impacts and viability impairment." *Id.* at 738 (brackets added). The EPA continued that in response to concerns that the threshold for establishing disproportionate economic hardship was "too stringent," Congress clarified that such hardship "can exist if DOE finds that a small refinery is experiencing *either* disproportionate impacts *or* viability impairment." *Id.* (emphasis in original). Once again, the EPA stated that hardship "can exist on the basis of adverse structural conditions alone," and a difficult year "may exacerbate economic problems for small refineries that face disproportionate impacts[.]" *Id.* at 738–39.

The EPA thus decided that unfavorable structural conditions and other factors justified "100% relief" for Wynnewood. *Id.* at 739–41. The EPA focused on Wynnewood's financial performance in 2016 and the first three quarters of 2017, coupled with Wynnewood's net refining margins. *Id.* at 741. The EPA concluded by stating that Wynnewood would experience disproportionate economic hardship which "can be relieved in whole or in part by removing its RFS obligations for 2017." *Id.*

II.     THE BIOFUELS COALITION'S STANDING TO SUE

38

Although the EPA does not challenge the Biofuels Coalition's standing to sue, the Refineries do. Addressing those arguments requires an understanding of the four organizations that make up the Biofuels Coalition. The first organization is the Renewable Fuels Association ("RFA"), a trade association for the ethanol industry. Geoff Cooper Declaration ("Cooper Decl.") ¶ 2. RFA members include "companies that manufacture and market ethanol fuel to blenders and marketers of gasoline, as well as companies that provide goods and services (such as process technologies and raw feedstocks) to ethanol producers." *Id.* Through its President and Chief Executive Officer, RFA avers that its members "operate facilities in 24 states, from California to New York, and are responsible for the production of almost a third of the ethanol sold in the United States." *Id.* ¶¶ 2–3. The second organization is the American Coalition for Ethanol ("ACE"), another ethanol advocacy group. Brian Jennings Declaration ("Jennings Decl.") ¶ 2. It also counts as members both producers and other companies that support the industry. *Id.* ¶ 2 & Ex. A. Through its Chief Executive Officer, the organization attests that "[m]any of ACE's members" produce ethanol, and "[o]ther members grow crops, primarily corn, that are used in the production of renewable fuels." *Id.* ¶¶ 7–8.

The other two Biofuels Coalition members are similar, but even more focused on feedstocks. The third organization is the National Farmers Union ("NFU"), an advocacy group for "family farmers, ranchers and rural communities[.]" Roger Johnson Declaration ("Johnson Decl.") ¶ 2. According to the group's President,

39

"NFU's members include family farmers and growers of crops such as corn and soybeans[.]" *Id.* ¶¶ 2–4. NFU further declares that "[c]orn is used to produce most of the non-advanced portion of renewable fuels (conventional renewable fuel), and soybeans are used to produce biomass-based diesel." *Id.* ¶ 5. The fourth organization is the National Corn Growers Association ("NCGA"). NCGA's Chief Executive Officer declares that the association "represents more than 40,000 dues-paying corn farmers nationwide and more than 300,000 corn growers who contribute to NCGA through the corn programs (known as 'checkoff' programs) in their states." Jon Doggett Declaration ("Doggett Decl.") ¶¶ 1–3, 5. NCGA reiterates that "[c]orn is used as a feedstock to make ethanol[.]" *Id.* ¶ 6.

The Constitution specifies that the "judicial Power of the United States" extends only to "Cases" and "Controversies." U.S. Const. art. III, §§ 1–2. Standing to sue "is a doctrine rooted in the traditional understanding" of those terms. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The doctrine "requires federal courts to satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy so as to warrant *his* invocation of federal-court jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (citation and internal quotation marks omitted, emphasis in original). By limiting the category of litigants empowered to maintain a federal lawsuit, the law of Article III standing "serves to prevent the judicial process from being used to usurp the powers of the political branches, and confines the federal courts to a properly judicial role." *Spokeo*, 136 S. Ct. at 1547 (citations and internal quotation marks omitted).

40

The "irreducible constitutional minimum" of standing is threefold. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 136 S. Ct. at 1547. An injury in fact must be not only "concrete and particularized," but also "actual or imminent," as opposed to "conjectural" or "hypothetical." *Lujan*, 504 U.S. at 560 (citations and internal quotation marks omitted). "Although the 'traceability' of a plaintiff's harm to the defendant's actions need not rise to the level of proximate causation, Article III does require proof of a substantial likelihood that the defendant's conduct caused the plaintiff's injury in fact." *Habecker v. Town of Estes Park, Colo.*, 518 F.3d 1217, 1225 (10th Cir. 2008) (citation and internal quotation marks omitted). And "[t]o demonstrate redressability, a party must show that a favorable court judgment is likely to relieve the party's injury." *WildEarth Guardians v. Pub. Serv. Comm'n of Colo.*, 690 F.3d 1174, 1182 (10th Cir. 2012) (citation omitted).

"The party invoking federal jurisdiction bears the burden of establishing" standing. *Lujan*, 504 U.S. at 561. Each element "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* On a direct appeal from an administrative decision, the complainant "must produce evidence on each element of standing as if it were moving for summary judgment in district court." *N. Laramie Range Alliance v. FERC*, 733 F.3d 1030,

41

1034 (10th Cir. 2013). If a counterparty contests these facts, the complainant will not enjoy "the benefit of any inference" and must discharge its burden under a preponderance-of-the-evidence standard. *Id.* (citation omitted). The evidence must show that the complainant "had standing when it filed its petition for review." *Id.*

An association seeking to invoke federal court jurisdiction must make a further showing. The association must demonstrate that "its members would otherwise have standing to sue in their own right;" "the interests it seeks to protect are germane to the organization's purpose;" and "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Because the Refineries in this case do not challenge the latter two components, we focus on the core elements of standing, keeping in mind that "the gist of the question" is whether members of the Biofuels Coalition "have such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination." *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007) (citation and internal quotation marks omitted). We also recognize that "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." *Summers*, 555 U.S. at 494 (citation and internal quotation marks omitted).

The Biofuels Coalition principally relies on an affidavit and a report from RFA's chief economist to prove standing. Scott Richman Declaration ("Richman

42

Decl.") ¶¶ 1–5. The economist provides his estimation, in gallons, of total renewable fuel obligations for Cheyenne and Woods Cross in 2016 and Wynnewood in 2017. *Id.* ¶ 10. He then identifies, as a percentage, what the extensions granted to the Refineries represent in terms of all exempted volumes. Scott Richman Report ("Richman Report") at 3, 12–13, 17. He observes that the EPA reinstated the RINs Cheyenne and Woods Cross had previously retired for compliance purposes in 2016, and he appears to assume the agency simply relieved Wynnewood of its RIN retirement obligation in 2017. Richman Decl. ¶¶ 12, 23. He then opines that the Refineries can "use these reinstated RINs in many ways," including selling the RINs to other obligated parties or using the RINs to satisfy RVOs for other refineries owned by the same corporate parent. *Id.* ¶¶ 13, 23. He maintains that the Refineries' sale or use of these RINs to establish compliance inflicts "economic harm" on members of the Biofuels Coalition, because obligated parties use such RINs "instead of blending ethanol or obtaining RINs representing additional blending from other parties." *Id.* ¶¶ 9, 23.

RFA's economist bases this conclusion on an industry-wide analysis of the effects of the 48 small refinery exemption extensions granted overall for 2016 and 2017, as well as the effects of the three exemption extensions at issue in this case. *Id.* ¶¶ 5, 18, 21. He observes that there are approximately 2.59 billion carryover RINs available to meet 2019 renewable fuel volume requirements, and he attributes most of these carryover RINs to the 48 extensions. *Id.* ¶ 15 & n.6 (citing an earlier publication of the EPA 2019 Standards, 83 Fed. Reg. at 63,709); Richman Report at 9

43

& n.10 (same). This, according to the economist, has "contributed to reduced demand and lower per-gallon prices for ethanol. These factors have resulted in lower revenues received by RFA's ethanol producing members." Richman Decl. ¶ 5; Richman Report at 1. In particular, he states that extensions in the aggregate have caused the ethanol "blend rate," or ethanol's average inclusion in the nation's gasoline supply, to fall by 162 million gallons from February 2018 to August 2018. Richman Decl. ¶ 16; Richman Report at 1, 9–11, 24–25. Valuing ethanol at $1.45 per gallon during this time period, he asserts that the drop in the blend rate resulted in an estimated $233 million revenue reduction for the industry and an estimated $68 million revenue reduction for RFA members. Richman Decl. ¶ 17; Richman Report at 16–17. For this same time period, he calculates estimated revenue reductions for the industry overall and for RFA members due to the Refineries' extensions. Richman Decl. ¶ 18; Richman Report at 17.

RFA's economist claims these numbers are conservative. He reasons that the foregoing numbers understate the economic injury to the Biofuels Coalition because "the reduction in demand has forced RFA members and other producers to sell ethanol at lower prices than that which they would receive" had small refinery extensions not been granted. Richman Decl. ¶ 19; Richman Report at 17–19. He attests that ethanol prices would have been $0.08 per gallon higher in February 2018 absent these extensions, and $0.34 per gallon higher by June 2018 "given the continued effect on consumption[.]" Richman Decl. ¶ 20; Richman Report at 2–3, 19. "Without adjusting for any possible increase in production due to increased

44

consumption that would have occurred" in the absence of the 48 small refinery extensions, he argues, from February to August 2018 the annualized impact on industry revenues was $4 billion and the annualized impact on RFA members' revenues was $1.2 billion. Richman Report at 19–20. He closes by attributing a substantial amount of "unrealized value" across the industry – and a specific amount of "unrealized value" for RFA members – to the Refineries' exemptions. Richman Decl. ¶ 21; Richman Report at 3, 20–21.

The Refineries do not meaningfully dispute that this evidence is sufficient to establish an injury in fact, the first prong of the test for Article III standing. "For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017); *see also Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017) ("Economic harm to a business clearly constitutes an injury-in-fact. And the amount is irrelevant. A dollar of economic harm is still an injury-in-fact for standing purposes."). The financial losses claimed by the Biofuels Coalition fit this description. The alleged losses are concrete in that they are quantified in dollars. The alleged losses are particularized in that they affect each Biofuels Coalition member who produces ethanol or ethanol feedstocks.

Certain Biofuels Coalition members also have cognizable injuries as competitors. Probable economic injury resulting from governmental actions which "alter competitive conditions" can constitute an injury in fact. *Clinton v. City of N.Y.*, 524 U.S. 417, 432-33 (1998) (citation omitted). Put another way, "economic

actors suffer constitutional injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition." *Nat'l Biodiesel Bd. v. EPA*, 843 F.3d 1010, 1015 (D.C. Cir. 2016) (citation and internal quotation marks omitted); *see also Citizens for Responsibility & Ethics in Washington v. Trump*, 939 F.3d 131, 143 (2d Cir. 2019) (explaining that competitor standing "relies on economic logic to conclude that a plaintiff will likely suffer an injury-in-fact when the [defendant] acts in a way that increases competition or aids the plaintiff's competitors") (citation omitted, brackets in original).

The record reflects at least some degree of competition between the Refineries and certain members of the Biofuels Coalition. The former produce or market conventional fuels, and the latter produce or market alternative fuels. One of the goals of the RFS program is to replace crude oil with biofuel, *see supra* § I, and alternatives like ethanol displace the traditional components of petroleum-based fuel. *See, e.g.,* Declaration of Scott Mundt ¶ 5 ("RFS requires refiners to use specified volumes of renewable fuel, such as ethanol, to reduce the quantity of petroleum-based transportation fuel."); 2011 DOE Study, REC1 at 504 ("Ethanol serves to displace other blending components of gasoline."); HollyFrontier Corporation 2015 Form 10-K at 27 (Feb. 24, 2016), REC1 at 41 (stating on behalf of the parent entity for Cheyenne and Woods Cross that "we compete with other industries that provide alternative means to satisfy the energy and fuel requirements of our industrial, commercial and individual consumers," and "[t]he more successful these alternatives become" the greater the impact on "pricing and demand for our products and

46

profitability"). The EPA's decision to extend the small refinery exemption relieves the Refineries from having to pay for blending or RINs associated with renewable fuels, including the types of fuel generated by Biofuels Coalition members. *See supra* § I.C.1-3. There is injury in fact.

The Refineries dispute the second Article III standing requirement, namely, whether the losses claimed by the Biofuels Coalition are "fairly traceable" to the EPA's decisions to grant the three petitions at issue. Cheyenne, Woods Cross, and Wynnewood each argue that there is no evidence showing any *individual* extension of the small refinery exemption harmed any *individual* Biofuels Coalition member. For example, Cheyenne and Woods Cross insist that their exempted RINs constitute only a tiny fraction of the total RFS obligation. The Refineries also contend that RFA's economist did not analyze whether any one extension resulted in lower ethanol sales or prices for any one producer, and that RFA's economist at best has identified correlation between (rather than proving causation for) ethanol demand and carryover RINs.

These arguments are colorable, but we conclude that the "fairly traceable" requirement is satisfied. In *Massachusetts*, a coalition of States, local governments, and private organizations alleged that the EPA abdicated its responsibility to regulate certain greenhouse emissions from new motor vehicles under the Clean Air Act. 549 U.S. at 504. Although "[t]he harms associated with climate change" were "serious and well recognized," *id.* at 521, the EPA challenged the coalition's standing to sue by asserting that any decision not to regulate emissions from new vehicles

47

contributed "insignificantly to petitioners' injuries," and regulating said emissions would be a drop in the worldwide bucket and immaterial to mitigating "global climate change." *Id.* at 521, 523–24. The Supreme Court did not accept this line of reasoning:

> The EPA overstates its case. Its argument rests on the erroneous assumption that a small incremental step, because it is incremental, can never be attacked in a federal judicial forum. Yet accepting that premise would doom most challenges to regulatory action. Agencies, like legislatures, do not generally resolve massive problems in one fell regulatory swoop. They instead whittle away at them over time, refining their preferred approach as circumstances change and as they develop a more nuanced understanding of how best to proceed.

*Id.* at 524 (citation omitted). *Massachusetts* thus held "[w]hile it may be true that regulating motor-vehicle emissions will not by itself *reverse* global warming, it by no means follows that we lack jurisdiction to decide whether EPA has a duty to take steps to *slow* or *reduce* it." *Id.* at 525 (emphasis in original); *see also Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 902 (10th Cir. 2012) ("[T]he Supreme Court concluded that Massachusetts had standing to challenge the EPA's refusal to regulate greenhouse-gas emissions despite the attenuated causal chain linking agency non-action to potential environmental damage.").

The causal chain linking the EPA's grants of the Refineries' extension petitions to potential economic damage to the Biofuels Coalition is no more attenuated. How much of an economic loss each Biofuels Coalition member may have sustained as a result of the EPA's decision to grant a given refinery petition is certainly debatable, and the amount of any such loss may be impossible to precisely

48

quantify.  But the evidence presented is sufficient to show for standing purposes that Biofuels Coalition members who produce ethanol or feedstocks suffered some injury – even if each individual member's loss is small – which is fairly traceable to increasing the number of unretired RINs.  Paired with economic principles suggesting that lessened demand for a product will reduce the price, RFA's affidavit in this case is enough, in part because the record otherwise does not establish that all of the injury to Biofuels Coalition members is "th[e] result [of] the independent action of some third party not before the court."  *Lujan*, 504 U.S. at 560–61 (citation omitted, brackets in original).

We recognize that markets are often complicated, and nothing in today's opinion should be construed as holding that the analysis of RFA's economist is unimpeachable.  When evaluating standing, however, "[t]he judicial task of determining causation can be imprecise" because courts must make a "predictive judgment" about a "notoriously difficult issue" based on a pre-trial record. *Carpenters*, 854 F.3d at 6; *see also id.* (stating that "[c]ommon sense and basic economics" may be relevant to assessing causation in this context).  It is "well settled" for these purposes that "petitioners need not prove a cause-and-effect relationship with absolute certainty; substantial likelihood of the alleged causality meets the test."  *Nat. Res. Def. Council v. NHTSA*, 894 F.3d 95, 104 (2d Cir. 2018) (citation omitted); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014) (reiterating that "[p]roximate causation is not a requirement of Article III standing").  "This is true even in cases where the injury

49

hinges on the reactions of third parties" to an agency's conduct. *Nat. Res. Def. Council*, 894 F.3d at 104.

Additionally, more than just general competitive harm is fairly traceable to the extensions of the three small refinery exemptions at issue. Those extensions not only remove a large compliance burden from the Refineries, but also specifically relate to products (ethanol and ethanol feedstocks) that Biofuels Coalition members sold and continue to sell. Several courts have found causation for purposes of standing when government action results in concrete and particularized changes to a competitive relationship. *See, e.g., Nat'l Biodiesel Bd.*, 843 F.3d at 1015–16 (holding, based on the facts in a competitor standing case, that it was "self-evident" the complainants established "injury, causation, and redressability"); *Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 724 F.3d 206, 211–12 (D.C. Cir. 2013) (holding, based on the facts in a competitor standing case, that "[t]he causation and redressability requirements of Article III are easily satisfied").

The Refineries challenge redressability as well, the third component of the test for Article III standing. Pointing out that the RINs reinstated by the EPA were only valid in 2016 and 2017, Cheyenne and Woods Cross argue that vacating the EPA's grants of those petitions will not benefit the Biofuels Coalition now. Wynnewood joins in by arguing that it was unnecessary to "reinstate" any 2017 RINs at all for that refinery. The Refineries also contend that there is no statutory basis for the EPA to force them to retire different RINs in excess of RFS obligations for future years, and even if there were, it would be speculative to conclude this small set of RINs would

50

meaningfully affect ethanol prices or otherwise change the financial fortunes of individual Biofuels Coalition members.  This is especially true, the Refineries assert, given the Biofuels Coalition's allegation that there are already billions of cheap carryover RINs in the market.

Significantly, however, we have also taken cues from *Massachusetts* on redressability.  We stated in *Consumer Data* that "[t]he Supreme Court has rejected interpretations of the rule that demand complete redressability, stressing that a plaintiff need show only that a favorable decision would redress '*an* injury,' not '*every* injury.'"  678 F.3d at 902 (emphasis in original, quoting *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982)).  Referencing *Massachusetts*, we found that "[r]edressability was satisfied" because "the risk of harm would be reduced *to some extent* if petitioners received the relief they seek."  *Id.* (citation and internal quotation marks omitted, emphasis in original).  Even more pointedly, we rejected the argument that a favorable decision must redress at least one injury completely:

> [T]he State cites no authority for this theory, and neglects to account for *Massachusetts v. EPA* where the Court adopted the contrary conclusion – standing is proper where a favorable decision would relieve "some extent" of an injury.  Indeed, if the law required that the requested relief afford complete redress, the Supreme Court would not have allowed Massachusetts to proceed against the EPA, as there was no guarantee a favorable decision would mitigate against future environmental damage, must less redress it completely.

*Id.* at 905 (citation omitted, brackets added).  We recognized the same principle in *Chamber of Commerce of the U.S. v. Edmondson*, 594 F.3d 742 (10th Cir. 2010), concluding that "the harms alleged by the Chambers will likely be 'reduced to some

51

extent' by an injunction running against the Attorney General." *Id.* at 757–58

(citations omitted); *see also id.* at 757 n.16 ("An opposite holding would contravene

Supreme Court precedent so as to require complete redressability.").

We pause to address the Refineries' point that a favorable order will not affect

the market or redress any economic harm because all of the reinstated or exempted

RINs were for 2017 or earlier compliance years. While it is true that a given RIN

may be carried over only to the next compliance year, *see, e.g.,* 40 C.F.R.

§ 80.1427(6)(i), that RIN may have ongoing effects as a result of the carryover

*process*. A RIN generated in year one but used in year two reduces the amount of

blending that must be done or the number of RIN purchases that must be made in the

second year. This process then repeats itself year to year. In year two, for instance,

any excess blending accomplished or excess RINs acquired may be carried over for

compliance purposes to year three. The EPA appears to have implicitly

acknowledged these ripple effects by noting in its proposed standards for 2019 that

"[w]hile EPA cannot predict how obligated parties will comply in 2018 or the

amount of additional small refinery hardship exemptions that may be granted in the

future, the 2016 and 2017 exemptions have directly increased the number of

carryover RINs that will likely be available for compliance with the 2019 standards."

Renewable Fuel Standard Program: Standards for 2019 and Biomass-Based Diesel

Volume for 2020, 83 Fed. Reg. 32,024, 32,030 (proposed July 10, 2018).

Moreover, although we do not decide today the nature or scope of the EPA's

remedial powers, we conclude that vacating or invalidating the extensions of the

Refineries' exemptions is "likely" to lead to EPA action addressing the contested 2016–2017 RINs, thus at least partially redressing the Biofuels Coalition's alleged harms. In addition to authorizing civil penalties, *see* 42 U.S.C. § 7545(d)(1), the amended Clean Air Act conveys to federal courts the power to award injunctive and "other appropriate" relief for specified violations of the statute or accompanying regulations. *See id.* § 7545(d)(2). The statute then directs the EPA to promulgate regulations to "ensure" that gasoline sold "contains the applicable volume of renewable fuel." *Id.* § 7545(o)(2)(A)(i). Among other things, those regulations prohibit creating or transferring "a RIN that is invalid," 40 C.F.R. § 80.1460(b)(2), failing to acquire sufficient RINs or using invalid RINs "to meet the person's RVOs," *id.* § 80.1460(c)(1), and causing another person to commit these and other violations. *Id.* § 80.1460(d).

On more than one occasion, the EPA has requested legal action seeking after-the-fact retirements of RINs. Two examples are highlighted on the EPA's website. *See* Civil Enforcement of the Renewable Fuel Standard Program, https://www.epa.gov/enforcement/civil-enforcement-renewable-fuel-standard-program (last visited January 17, 2020). In *United States v. NGL Crude Logistics, LLC*, No. 2:16-cv-1038-LRR (N.D. Iowa), a complaint filed in 2016 "at the request of the Administrator" sought to require the defendant to retire approximately 36 million invalid RINs from 2011 to "offset the harm caused by the violations." *NGL Crude Logistics* Docket No. 21 at 1, 9–13, 23. The parties entered into a consent decree that accomplished just that, with the defendant retiring the RINs in 2018–

2019. *Id.* Docket No. 247 at 1, 6–7. In *United States v. Chemoil Corp.*, No. 4:16-cv-05538-PJH (N.D. Cal.), the complaint filed at the EPA's request sought to require the defendant to retire approximately 73 million RINs to comply with RVOs from 2011–2013. *Chemoil Corp.* Docket No. 1 at 10, 14. That case was also resolved via a consent decree, with the defendant retiring 65 million RINs in 2016–2017. *Id.* Docket No. 7 at 4, 10. The purpose of these illustrations is not to comment on the legal merits of the cases, but instead to demonstrate the likelihood of the EPA taking further action to offset the effects of any 2016–2017 refinery RINs that are vacated or deemed invalid by court order.

Post-*Sinclair* events reinforce this conclusion. After holding that an existential threat to a refinery's existence was not the *sine qua non* of "disproportionate economic hardship," this court vacated two agency orders denying hardship relief and granted the EPA's request for a voluntary remand and vacatur with respect to a third. *Producers of Renewables United for Integrity Truth & Transparency v. EPA*, 778 F. App'x 1, 2–3 (D.C. Cir. 2019). On remand, the EPA granted extensions of these Wyoming refinery exemptions, and ordered a form of prospective relief:

> The three Wyoming refineries had by then demonstrated compliance with the 2014 and 2015 standards by retiring RINs for those years, and those RINs had since expired. The EPA thus decided that, in order to provide the refineries with "meaningful relief" from their since-excused compliance, it would "replac[e]" the retired, expired RINs with an equal number of newly minted 2018 RINs.

*Id.* at 3 (quotation marks and brackets in original). A petitioner challenged the EPA's RIN-replacement orders, and the D.C. Circuit transferred the case to this court. *Id.* at

54

3–4. Again, we raise this matter not to pre-judge the merits of *Producers of Renewables*, as those merits will be evaluated by a different panel of this court. We highlight the case solely to show a likelihood that the EPA will not sit on its hands if prior refinery RINs are invalidated.

The competitor standing doctrine likewise informs redressability. The EPA's decisions to lift renewable fuel requirements by extending the small refinery exemption convey an advantage to the Refineries linked to the principal economic activity of certain Biofuels Coalition members (generating, marketing, and selling ethanol). Courts invoking competitor standing observe that redressability is "closely related to the question of causation," and when the complainants are subjected to some form of ongoing harm, "it logically follows that relief would redress their injury – at least to some extent, which is all that Article III requires." *Citizens for Responsibility & Ethics in Washington*, 939 F.3d at 147; *see also United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973) (declining to limit standing to "those who have been 'significantly' affected by agency action," and noting that "an identifiable trifle is enough for standing to fight out a question of principle") (citation omitted).

Because standing defines and limits the power of the judicial branch, it does not exist for the convenience of the parties. Standing must be based on specific facts satisfying all required legal elements, just as our determination that the Biofuels Coalition has standing is based on the facts presented here. Still, the implications of the Refineries' position cannot be overlooked. This case is unusual because it

55

involves decisions to grant three small refinery extension petitions, as opposed to just one. There is evidence in the record that these three Refineries collectively account for a non-trivial amount of exempted renewable fuel. This case also involves multiple third-party producers, acting through the trade associations or advocacy groups that constitute the Biofuels Coalition. There is evidence that these producers collectively account for a non-trivial amount of ethanol and ethanol feedstocks. If these complainants lack a "fairly traceable" and "redressable" injury vis-à-vis these Refineries, it is hard to imagine ones that would. In other words, if the Refineries are correct on the issue of standing, then EPA decisions to reduce renewable fuel obligations under the Clean Air Act by granting extensions of the small refinery exemption may be effectively unreviewable.

This threat is heightened by the manner in which extension petitions are granted. Small refineries understandably do not want to publicize otherwise restricted financial information. So the refineries request that their petitions be kept confidential. *E.g.*, REC2 at 598, 653, 687; *see also supra* § I.C (surveying some of the legal bases for confidentiality designations). Given these confidentiality concerns, the EPA normally does not publish decisions granting small refinery petitions, in the Federal Register or anywhere else. *See Sinclair*, 887 F.3d at 992 ("Nor do third parties have access to the decisions, since the EPA does not publicly release its decisions because they contain confidential business information."). This makes it difficult for outsiders to determine when petitions have been filed and granted. Members of the Biofuels Coalition claim that they only found out about the

agency's decisions in this matter through Reuters articles and public company disclosure documents like Forms 10-K. Cooper Decl. ¶ 12; Jennings Decl. ¶ 5; Johnson Decl. ¶ 8; Doggett Decl. ¶ 8. Yet without participation by third parties, it is difficult to see how EPA decisions granting small refinery petitions will ever be subject to appellate review. A small refinery that receives an extension of its renewable fuels exemption has no incentive to appeal. Nor does the EPA have any incentive to appeal its own decision.

Excepting these EPA small refinery decisions from judicial review aimed at ensuring statutory compliance would be troublesome. "Congress rarely intends to prevent courts from enforcing its directives to federal agencies." *Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645, 1651 (2015). The Administrative Procedure Act ("APA") "creates a basic presumption of judicial review [for] one suffering legal wrong because of agency action." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) (citation and internal quotation marks omitted, brackets in original). The Supreme Court has long characterized the presumption favoring judicial review as "strong," and it can be rebutted only upon a showing that "Congress wanted an agency to police its own conduct." *Mach Mining*, 135 S. Ct. at 1651 (citation omitted). No such showing has been made here, as nothing in the amended Clean Air Act directly "precludes review" of EPA decisions granting small refinery petitions, and "federal courts routinely assess" these types of adjudications under APA provisions such as 5 U.S.C. § 706(2). *Weyerhaeuser*, 139 S. Ct. at 370, 371. Accepting the Refineries' standing arguments would largely negate this

presumption and preclude any judicial review of orders granting extensions of the small refinery exemption.

III.    OTHER JURISDICTIONAL ISSUES

The Refineries present several other challenges to jurisdiction.  In addition to contesting jurisdiction based on the 2014 change in the EPA's definition of "small refinery," *see infra* § IV.A.2, the Refineries separately contend that the Biofuels Coalition was required to, but did not, file this action within 60 days of the issuance of the EPA orders granting the Refineries' hardship petitions.  The Refineries maintain as well that the Biofuels Coalition, notwithstanding its status as a non-party to agency proceedings on the Refineries' hardship applications, was required to present its arguments to the EPA before seeking judicial review.  The EPA contests jurisdiction based on the 2014 Small Refinery Rule, but does not join either of the Refineries' other two jurisdictional arguments.

A.    TIMELINESS

The Clean Air Act generally requires challenges to final agency actions to be filed "within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register[.]"  42 U.S.C. § 7607(b)(1).  "The deadline in § 7607(b)(1) is jurisdictional."  *Utah v. EPA*, 765 F.3d 1257, 1258 (10th Cir. 2014).  Because "Congress waived sovereign immunity through § 7607(b)(1)," the 60-day deadline "serves a jurisdictional function" by restricting this congressional waiver.  *Id.* at 1260.  The relevant EPA regulation states that "[u]nless the Administrator otherwise explicitly provides in a particular promulgation, approval, or action, the

58

time and date of such promulgation, approval or action" for purposes of § 7607(b)(1) "shall be at 1:00 p.m. eastern time (standard or daylight, as appropriate) on (a) for a Federal Register document, the date when the document is published in the Federal Register, or (b) for any other document, two weeks after it is signed."  40 C.F.R. § 23.3.

The history of § 23.3 is instructive.  The main reason the EPA proposed this provision and related provisions was "to bring greater fairness to so-called 'races to the courthouse.'"  50 Fed. Reg. 7,268 (Feb. 21, 1985).  Litigants looked for what they perceived as friendly courts regarding the interpretation of certain statutes.  They then sought "by various means to be the first to be informed of an Agency action and then to be the first to file a petition for review in one of the [friendliest of the] twelve United States courts of appeals."  *Id.* (brackets added).  The Clean Air Act, by providing for "exclusive judicial review in the D.C. Circuit of EPA's nationally-applicable regulations," eliminated "a great many racing opportunities," but not all of them, and other statutes contained no provisions to reduce racing.  *Id.*  In promulgating the new rules, the agency sought to "eliminate the worst abuses associated with races to the courthouse under those EPA-administered statutes that allow racing and under which races are reasonably likely to occur."  *Id.*

One commenter objected to the new rules on the ground that "affected persons may have no notice of the action" and be deprived of due process.  *Id.* at 7,269.  The EPA addressed that concern by noting that "[m]ost potential litigants interested in actions covered by the regulations will have actual notice of non-Federal Register

documents." *Id.* As to litigants with notice, the EPA observed that the rule "will have the beneficial effect of establishing a fixed trigger for commencing the judicial review process." *Id.* Litigants without notice were not part of any race to the courthouse, and thus were not addressed by the rule: "The commenter's concern – that someone entitled to seek judicial review, and who has no notice of the action, will later be barred from obtaining review by a preclusive judicial review provision – addresses a matter not within the scope of this rulemaking. Any such claim can be raised in judicial proceedings if it arises in practice." *Id.*

The Refineries assert that the reference to "any other document" in the text of § 23.3 trumps any preamble, but there is no conflict between the two. The rule provides that agency actions reflected in the Federal Register become final at 1:00 p.m. eastern time on the date of publication, and agency actions reflected in other documents become final two weeks after publication. The rule is silent as to whether this principle of finality applies to agency actions effected by "other document[s]" when parties are without notice. It does not say parties without notice are, or are not, subject to the rule. Instead, it leaves that issue to be "raised in judicial proceedings if it arises in practice." 50 Fed. Reg. at 7,269.

Filling this silence by construing § 23.3 to foreclose appeals by parties without notice would be irrational. What possible purpose would be served by such an interpretation, other than to immunize unpublished agency actions from third party scrutiny? The agency's justification for promulgating the rule in the first instance – setting a fixed trigger for commencing the judicial review process – does not apply to

60

parties without notice who cannot participate in any race to the courthouse. As a result, the Refineries' proposed interpretation of § 23.3 is not just inconsistent with the strong presumption favoring judicial review of agency action. *See supra* § II. It is also in tension with the enduring principle that if a literal interpretation would "lead to absurd results, or be contrary to the evident meaning of the act taken as a whole, it should be rejected." *Heydenfeldt v. Daney Gold & Silver Mining Co.*, 93 U.S. 634, 638 (1876).

We summarize our ruling as follows: The 60-day deadline in 42 U.S.C. § 7607(b)(1) did not render the Biofuels Coalition's petition untimely. Because agency orders granting the Refineries' hardship petitions were not published in the Federal Register, the statutory clock never started.[3] The EPA regulation implementing the statute states that documents other than those published in the Federal Register become final two weeks after they are signed, but the text and the preamble demonstrate that the regulation does not address parties without notice of such "other documents." The Refineries' attempt to invoke the statutory cut-off is misguided.

B.    RIPENESS

---

[3] The statute also permits a party seeking review "based solely on grounds arising after such sixtieth day" to submit a petition "within sixty days after such grounds arise." 42 U.S.C. § 7607(b)(1). Here, however, there is no way to hold that the Biofuels Coalition's petition is based exclusively on grounds arising 60 days after any publication in the Federal Register (thus triggering the "after-arising" 60-day filing period), because no publication ever took place.

The Refineries' other argument is couched in terms of ripeness. Although federal courts have a "virtually unflagging" obligation to hear and decide cases within their jurisdiction, *Lexmark*, 572 U.S. at 126 (citations omitted), the ripeness doctrine is intended "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (citation omitted). "Determining whether administrative action is ripe for judicial review requires us to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Id.* at 808.

The "fitness for judicial decision" criterion favors review. Relevant considerations include whether "the issue is a purely legal one," whether "the agency decision in dispute was final," whether the court would "benefit from further factual development of the issues presented," and whether "judicial intervention would inappropriately interfere with further administrative action[.]" *Wyoming v. Zinke*, 871 F.3d 1133, 1141–42 & n.2 (10th Cir. 2017) (citations and internal quotation marks omitted). No one disputes that the refinery orders constitute final agency actions. The core statutory interpretation issues are predominantly legal. Combined with the public record, the existing agency record is sufficient to decide the fact-based issues that have been presented on appeal. The EPA's position is crystallized

in three written orders granting the refinery petitions. There is no indication that the EPA intends to reconsider those orders, so judicial review will not interfere with any ongoing or contemplated administrative activity.

The "hardship to the parties" criterion favors review as well. We have afforded substantial weight to the hardship element when complainants face "significant costs, financial or otherwise," if their disputes are deemed unripe for adjudication, and when the respondent has "taken some concrete action" that impairs or threatens to impair the petitioner's interests. *Utah v. U.S. Dep't of Interior*, 535 F.3d 1184, 1197–98 (10th Cir. 2008). All of those factors are present here. The EPA has taken concrete action by granting the Refineries' extension petitions. Exempting the Refineries from RFS compliance impairs the interests of Biofuels Coalition members by increasing competition and reducing the value of products those members market and sell. The alleged harm suffered by Biofuels Coalition constituents will worsen if judicial review is delayed or denied.

The Refineries cite authorities discussing the benefits of allowing an administrative agency to consider the precise question raised, adding that a litigant waives any argument not so presented. The cases indicate that parties "generally must structure their participation so that it alerts the agency to the parties' position and contentions, in order to allow the agency to give the issue meaningful consideration." *Forest Guardians v. U.S. Forest Serv.*, 495 F.3d 1162, 1170 (10th Cir. 2007) (citations and internal quotation marks omitted). The cases also explain that the waiver rule ensures "simple fairness" to the agency and other affected

litigants, while providing a court "with a record to evaluate complex regulatory issues[.]" *ExxonMobil Oil Corp. v. FERC*, 487 F.3d 945, 962 (D.C. Cir. 2007) (citation omitted).

This general presentment requirement does not cause the case at hand to be unripe. Biofuels Coalition members received no notice of and no invitation to participate in the proceedings culminating in the refinery extension orders. Biofuels Coalition members were thus *precluded* from raising administrative arguments in opposition to the refinery extensions, and the EPA cannot be forced to conduct a brand new hearing. This court is powerless to require administrative procedures in addition to those set forth in the APA, *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978), which beyond its plain text imposes only "a general 'procedural' requirement of sorts by mandating that an agency take whatever steps it needs to provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision." *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990). Even if the refinery orders and the existing administrative record in theory could be more tailored to each argument giving rise to this appeal, they in practice provide adequate facts and a sufficient explanation of the EPA's reasoning to permit judicial review.

IV.    THE BIOFUELS COALITION'S STATUTORY CONSTRUCTION CHALLENGES

The Biofuels Coalition contends that the EPA exceeded its statutory authority in at least three respects by granting the Refineries' petitions. First, the Biofuels Coalition asserts that the EPA failed to honor the statutory requirement of an

"extension," confusing an extension of an exemption with a plain-vanilla exemption. Second, the Biofuels Coalition argues that the EPA robbed the phrase "disproportionate economic hardship" of its intended meaning by focusing on structural factors and eschewing a comparative analysis to determine which hardships are disproportionate. Third, the Biofuels Coalition says the EPA neglected to require that any disproportionate economic hardship was caused by compliance with RFS obligations.

These arguments rise or fall with the provisions in 42 U.S.C. § 7545(o)(9). For reference, those provisions state in relevant part:

**(9) Small refineries**

**(A) Temporary exemption**

**(i) In general**

The requirements of paragraph (2) shall not apply to small refineries until calendar year 2011.

**(ii) Extension of exemption**

**(I) Study by Secretary of Energy**

Not later than December 31, 2008, the Secretary of Energy shall conduct for the Administrator a study to determine whether compliance with the requirements of paragraph (2) would impose a disproportionate economic hardship on small refineries.

**(II) Extension of exemption**

In the case of a small refinery that the Secretary of Energy determines under subclause (I) would be subject to a disproportionate economic hardship if required to comply with paragraph (2), the Administrator shall extend the exemption

65

under clause (i) for the small refinery for a period of not less than 2 additional years.

**(B) Petitions based on disproportionate economic hardship**

**(i) Extension of exemption**

A small refinery may at any time petition the Administrator for an extension of the exemption under subparagraph (A) for the reason of disproportionate economic hardship.

**(ii) Evaluation of petitions**

In evaluating a petition under clause (i), the Administrator, in consultation with the Secretary of Energy, shall consider the findings of the study under subparagraph (A)(ii) and other economic factors.

**(iii) Deadline for actions on petitions**

The Administrator shall act on any petition submitted by a small refinery for a hardship exemption not later than 90 days after the date of receipt of the petition.

42 U.S.C. §§ 7545(o)(9)(A)–(B) (emphasis in original).

Plain and unambiguous statutory language must be enforced "according to its terms," because we assume "the ordinary meaning of that language accurately expresses the legislative purpose." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010) (citation and internal quotation marks omitted). To decide whether the language of a statute is plain, "we must read the words in their context and with a view to their place in the overall statutory scheme." *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) (citation and internal quotation marks omitted). A statute generally should be interpreted "so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Rubin v. Islamic*

66

*Republic of Iran*, 138 S. Ct. 816, 824 (2018) (citation and internal quotation marks omitted). The goal is to view the law "as a symmetrical and coherent regulatory scheme" and to "fit, if possible, all parts into an harmonious whole." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (citations and internal quotation marks omitted); *see also Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010) (indicating that a court's duty is "to construe statutes, not isolated provisions") (citation and internal quotation marks omitted).

A.    EXTENSION OF EXEMPTION

The APA states that a reviewing court shall "hold unlawful and set aside agency action, findings and conclusions" found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2)(C). The APA further states that "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." *Id.* § 706. When reviewing an agency's legal determination, the court generally applies the standard of review articulated by the Supreme Court in *Chevron v. Natural Resources Defense Council*, 467 U.S. 837 (1984). *See id.* at 842–44 (asking "whether Congress has directly spoken to the precise question at issue," and if not, "whether the agency's answer is based on a permissible construction of the statute").

There are times, however, when *Chevron* is inapplicable. "[L]egislative rules and formal adjudications are always entitled to *Chevron* deference, while less formal pronouncements like interpretive rules and informal adjudications may or may not be entitled to *Chevron* deference." *Sinclair*, 887 F.3d at 990 (citation omitted); *see also United States v. Mead Corp.*, 533 U.S. 218, 229–30 (2001) ("It is fair to assume generally that Congress contemplates administrative action with the effect of law when it provides for a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force."). In *Sinclair*, we determined that "Congress did not intend the EPA's interpretation of 'disproportionate economic hardship' to have the 'force of law.'" 887 F.3d at 993. And we concluded that informal adjudications of petitions to extend the small refinery exemption were not subject to *Chevron* deference. *Id.* at 992; *see also id.* (noting, among other things, that such adjudications lack "trial-like procedures" and "the benefit of notice-and-comment").

When *Chevron* does not apply, "we follow the analysis set forth in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)." *Id.* at 991 (parallel citations omitted). *Skidmore* review means that the weight provided to an administrative judgment "will depend upon the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." 323 U.S. at 140 (brackets added). Put another way, an administrative ruling under *Skidmore* may

68

"claim the merit of its writer's thoroughness, logic, and expertness, its fit with prior interpretations, and any other sources of weight." *Mead*, 533 U.S. at 235.

### 1.    TEXTUAL ANALYSIS

For the Biofuels Coalition's first statutory argument, we begin with the text referring to an "Extension of Exemption." The small refinery exemption subject to an extension in this section of the amended Clean Air Act is expressly identified as "Temporary" in subpart (A). 42 U.S.C. § 7545(o)(9)(A). That temporary exemption for small refineries initially lasted until calendar year 2011. *Id.* § 7545(o)(9)(A)(i). Congress decided this temporary exemption could be extended past 2010 for a given small refinery if compliance, as determined by a DOE study, would impose disproportionate economic hardship. *Id.* § 7545(o)(9)(A)(ii). In subpart (B), Congress decided that this temporary exemption could also be extended past 2010 for a small refinery if compliance, as adjudicated by the EPA in response to that refinery's petition, would impose disproportionate economic hardship. *Id.* § 7545(o)(9)(B)(i)–(ii).

A common definition of "extension" that meshes with this statutory scheme is apparent. Several dictionaries include a definition of "extension" to the effect of "an increase in length of time," especially "an increase in time allowed under agreement or concession." *Extension*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary (last visited January 17, 2020); *see also Extension*, Collins Online Dictionary, https://www.collinsdictionary.com/dictionary/english ("Collins," last visited January

69

17, 2020) ("An extension is an extra period of time for which something lasts or is valid, usually as a result of official permission."); *Extension*, Dictionary.com Online Dictionary, https://www.dictionary.com/browse ("Dictionary.com," last visited January 17, 2020) ("[A]n additional period of time given one to meet an obligation[.]"). Similar dictionaries contain a related definition of "extension": "[T]he fact of reaching, stretching, or continuing; the act of adding to something in order to make it bigger or longer." *Extension*, Cambridge Online Dictionary, https://dictionary.cambridge.org/us/dictionary/english ("Cambridge," last visited January 17, 2020); *see also Extension*, Dictionary.com ("[T]hat by which something is extended or enlarged; an addition[.]"); *Extension*, Lexico Online Dictionary, https://www.lexico.com/en/definition ("Lexico," last visited January 17, 2020) ("A part that is added to something to enlarge or prolong it."). These dictionaries also indicate that the definition of "extend" includes "to add to something in order to make it bigger or longer." *Extend*, Cambridge; *see also Extend*, Merriam-Webster ("[T]o cause to be longer: Prolong[.]") (capitalization omitted).

These ordinary definitions of "extension," along with common sense, dictate that the subject of an extension must be in existence before it can be extended. For example, if someone interested in current events subscribes to a news service in years one through five, allows the subscription to lapse in years six and seven, and goes back to the news service in year eight, we usually do not say that year eight was an "extension" of the subscription from years one through five. Rather, we say that the person renewed or restarted his or her subscription in year eight. Likewise, if

70

someone seeks and obtains permission in years one through five to shop at a members-only retailer, does not seek or is denied membership in years six and seven, but seeks and obtains membership in year eight, we typically do not say that the return to the retailer in year eight was an "extension" of the membership. We say, instead, that the person renewed or restarted his or her membership in year eight.

Paired with the rest of the amended Clean Air Act, therefore, common definitions of "extension" mean that a small refinery which did not seek or receive an exemption in prior years is ineligible for an extension, because at that point there is nothing to prolong, enlarge, or add to. Congress chose to provide an "*Extension* of exemption" for disproportionate economic hardship, based either on the results of the DOE study or on a meritorious petition. Congress did not provide an unlimited "*Exemption*" to every small refinery identified in the DOE study or with a meritorious petition. *See Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1659 (2017) (observing that "[w]hen legislators did not adopt 'obvious alternative' language, 'the natural implication is that they did not intend' the alternative") (citation omitted). Congress presumably used the term "extension" for a reason, and we should be hesitant to strip that word of significant meaning. *See TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (restating that "[i]t is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant") (citation and internal quotation marks omitted).

This interpretation of "extension" funnels small refineries toward compliance over time. The statute contemplates a "temporary" exemption for these entities "with an eye toward eventual compliance with the renewable fuels program for all refineries." *Hermes Consolidated, LLC v. EPA*, 787 F.3d 568, 578 (D.C. Cir. 2015). All small refineries were the beneficiaries of a blanket exemption from 2006 through 2010. According to the EPA, 24 of these small refineries received extensions of their exemptions in the aftermath of the 2011 DOE study. *See supra* § I.B. That number should have tapered down from 2013 forward, because the only small refineries from this group which continued to be eligible for extensions were ones that submitted meritorious hardship petitions each year. This reading of "extension" means that once a small refinery figures out how to put itself in a position of annual compliance, that refinery is no longer a candidate for extending (really "renewing" or "restarting") its exemption.

The EPA and the Refineries place significant weight on more recent Congressional pronouncements emphasizing the significance or breadth of the small refinery exemption. *See supra* § I.B. The Supreme Court has discouraged the use of "[p]ost-enactment legislative history (a contradiction in terms)," stating that such history "is not a legitimate tool of statutory interpretation." *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011). "Real (pre-enactment) legislative history is persuasive to some because it is thought to shed light on what legislators understood an ambiguous statutory text to mean when they voted to enact it into law. But post-enactment legislative history by definition could have had no effect on the

72

congressional vote." *Id.* (citations and internal quotation marks omitted). *Bruesewitz* assigned no value to "a Committee Report by a later Congress," *id.* at 241, consistent with other precedent. *See, e.g., Barber v. Thomas*, 560 U.S. 474, 486 (2010) ("[W]hatever interpretive force one attaches to legislative history, the Court normally gives little weight to statements, such as those of the individual legislators, made *after* the bill in question has become law.") (emphasis in original); *Graham*, 559 U.S. at 297–98 (refusing to rely on a letter written by the primary sponsors of a bill "13 years after the amendments were enacted," as the letter had "scant or no" interpretive value).

We need not decide whether the post-enactment history proffered by the EPA and the Refineries is off limits, because even if we consider those materials, they do not change the outcome. The post-enactment materials do not discuss the definition of "extension." Moreover, assuming *arguendo* that certain legislators thought the small refinery exemption was important, the ones who enacted the law also made clear that the renewable fuel targets reflected in the Energy Policy Act and the Energy Independence and Security Act were essential to promoting biofuel production, energy independence, and environmental protection. *See supra* §§ I.A–B; *see also American Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 568 (D.C. Cir. 2019) (confirming that the RFS program was intended to "move the United States toward greater energy independence and security" and "increase the production of clean renewable fuels") (citation omitted). Those targets were designed to be aggressive and "market forcing." *See supra* §§ I.A–B; *see also*

73

*Americans for Clean Energy v EPA*, 864 F.3d 691, 710 (D.C. Cir. 2017) ("[T]he Renewable Fuel Program's increasing requirements are designed to force the market to create ways to produce and use greater and greater volumes of renewable fuel each year."). To balance all of those policy concerns, Congress gave small refineries a substantial amount of time to adapt, commencing the RFS program with a blanket exemption that for some refineries ended up lasting seven years.

A small refinery in 2006 was in a much different position than a small refinery in 2016 or 2017. A small refinery in 2006 did not have a meaningful opportunity to consider in advance whether or how it could comply with renewable fuel obligations. In contrast, a small refinery in 2016 or 2017 had many years to ponder operational issues and compliance costs, including whether it made sense to enter into or remain in the market in light of the statute's challenging renewable fuels mandate. The EPA has long required each small refinery submitting an extension petition to consider and explain when the refinery will achieve compliance. 40 C.F.R. § 80.1441(e)(2)(i). So a small refinery in 2016 or 2017 had an ample opportunity to study and understand any disproportionate economic impact likely to be occasioned by meeting Congressional targets. Construing the word "extension" to require prior exemptions – as a predicate to prolongment or enlargement – limits but preserves the small refinery exemption while giving meaning to the remainder of 42 U.S.C. § 7545(o)(9).

Understanding "extension" to require a predicate "exemption" is not new. Through at least the first quarter of 2016, the EPA itself limited "extensions" to only those small refineries that qualified for the original blanket exemption. To illustrate,

74

in April 2016, the EPA denied a petition submitted by Dakota Prairie Refining, LLC

("Dakota Prairie") to extend the small refinery exemption in calendar year 2015.

Petition for Review, *Dakota Prairie Refining, LLC v. EPA*, No. 16-2692, at 8 of 17

(8th Cir. June 13, 2016) ("*Dakota Prairie* Appellate Petition").[4]  The EPA explained

that "[c]onsistent with the plain language of the CAA and in furtherance of

Congressional intent, EPA promulgated regulations that allow only small refineries

that previously had received the initial exemption to qualify for an extension of that

exemption." *Id.*  Hence, "EPA interprets and implements these provisions as

allowing those small refineries qualifying for the statutory temporary exemption as

now eligible for an extension of that exemption." *Id.*

The EPA explained the rationale for this construction in its April 2016 Dakota

Prairie denial letter.  The EPA recognized that "this approach is not only consistent

with the plain language of the statute and regulations, but also reflects the fact that

newer small refineries have the ability to consider whether they believe the

establishment of the RFS program and its requirements will cause economic hardship

before beginning operations." *Id.* at 8–9 of 17.  Furthermore, said the EPA, "this

approach avoids two possible negative consequences associated with any refinery

exemption – an increase in obligations for non-exempt facilities or the use of less

renewable fuel than EPA anticipated when it established the applicable percentage

---

[4] The Dakota Prairie petition for appellate review attaches the EPA's April 14, 2016 denial letter.  The petition and its attachments are available on PACER, and those materials are cited in footnote 4 on page 23 of the EPA's appellate brief in this case.

standards." *Id.* at 9 of 17. The EPA then put these principles into practice, stating that "[b]ased on the above, EPA is denying Dakota Prairie's request to evaluate its petition for a one-year small refinery exemption for its 2015 RFS obligations." *Id.*

The EPA and the Refineries contend that "extension" cannot be so interpreted because the statute allows a small refinery to tender a hardship petition "at any time." 42 U.S.C. § 7545(o)(9)(B)(i). Common definitions of "any" are indeed expansive. *See, e.g., Any*, Dictionary.com ("[W]hatever or whichever it may be[.]"); *Any*, Lexico (equating "any time" with "[a]t whatever time"); *Any*, Merriam-Webster ("[U]nmeasured or unlimited in amount, number, or extent[.]"). But even if a small refinery can *submit* a hardship petition at any time, it does not follow that every single petition can be *granted*. By that logic, the EPA could grant a 2019 petition seeking a small refinery exemption for calendar year 2009 – more than a decade after the fact. The EPA would also be empowered to grant a re-submitted extension petition for an earlier year even though the agency had previously denied that very petition. And aside from these hypothetical examples, EPA data show that the approach followed by the agency from 2016-forward has opened up a gaping and ever-widening hole in the statute. The number of petitions filed by small refineries has gone up substantially, and the EPA has granted nearly every hardship application. *See supra* § I.B.

In any event, a more delimited interpretation in which an "extension" requires a predicate exemption works hand-in-hand with the phrase "at any time." As noted, the EPA must issue annual RFS percentages by November 30 of the prior year. 42

76

U.S.C. § 7545(o)(3)(A)–(B).  Because they can submit petitions "at any time," small refineries seeking to extend their hardship exemptions are not limited by this November 30 deadline.  This is a significant statutory concession.  As explained by the D.C. Circuit:

> The problem is that while the EPA must promulgate annual percentage standards by November 30 each year, refineries may petition for an exemption "at any time," 42 U.S.C. § 7545(o)(9)(B)(i), and the EPA has no mechanism to adjust renewable fuel obligations to account for exemptions granted *after* each year's percentage standards are finalized.  As a result, because the EPA cannot ensure that non-exempt obligated parties compensate for the renewable-fuel shortfall created by belated exemptions, those gallons of renewable fuel simply go unproduced.

*American Fuel*, 937 F.3d at 571 (emphasis in original).  The EPA raises the percentage standards for non-exempt parties in a given year by subtracting from its calculations the transportation fuel contributions of small refineries that were granted exemptions before the EPA established the percentage standards in question.  *Id.* at 588 (citing 40 C.F.R. § 80.1405(c)).  "This solution, however, is only partial:  the EPA does not currently account for small refinery exemptions granted *after* it promulgates percentage standards for that year – so-called retroactive exemptions." *Id.* (emphasis in original).

In short, it confers a substantial benefit upon small refineries and it maintains a coherent regulatory scheme to interpret "at any time" to exempt hardship petitioners from the EPA's annual percentages deadline.  The EPA does not have a mechanism to fully compensate for volumes exempted as a result of later-filed or later-granted small refinery petitions, and the tool the EPA does have imposes concomitant

77

burdens on non-exempt obligated parties. *See id.* at 571 ("When calculating percentage standards for any given year, the EPA accounts for any small refineries that have received exemptions by requiring non-exempt obligated parties to produce proportionally more."). Interpreting the phrase "at any time" in this manner allows the word "extension" to maintain its ordinary meaning and to meaningfully promote the aims of the statute. The contrary interpretation suggested in this lawsuit by the EPA and the Refineries does not.

Although our charge is to evaluate only the EPA's adjudication of the three refinery petitions, we draw theoretical support from *Americans for Clean Energy*, 864 F.3d 691. One of the issues in that case was the meaning of the statutory waiver provision based on "inadequate domestic supply." 42 U.S.C. § 7545(o)(7)(A). The EPA attempted to defend a reading of that provision which was held inconsistent with the letter of the law and the spirit of Congress' "market forcing policy." 864 F.3d at 710. The EPA's proposed interpretation permitted the agency to unduly "bring the volume requirements down," and "[n]o argument" supported "that goal-defying (much less that text-defying) statutory construction." *Id.* (citation omitted); *see also id.* at 712 (commenting that the EPA's interpretation turned "the Renewable Fuel Program's 'market forcing' provisions on their head"). The D.C. Circuit observed that even if it were persuaded by the agency's policy arguments for lowering renewable fuel volume requirements, "those arguments could not overcome the statute's plain language, which is our primary guide to Congress' preferred policy. If the regime is indeed flawed, it is up to Congress and the President to

78

'reenter the field' and fix it." *Id.* (citations and first set of internal quotation marks omitted).

Because an "extension" requires a small refinery exemption in prior years to prolong, enlarge, or add to, the three refinery petitions in this case were improvidently granted. Wynnewood last received a hardship exemption in 2012. *See supra* § I.C.3. There is no evidence in the record that Woods Cross ever qualified for a hardship exemption, much less in the years preceding the refinery's most recent application to suspend compliance. *See id.* § I.C.2. Although Cheyenne presumably received an exemption in 2015, its original exemption expired no later than 2013. *See id.* § I.C.1. At most, these Refineries sought to renew or restart their exemptions in 2016 or 2017. The amended Clean Air Act did not authorize the EPA to grant the petitions.

### 2. THE 2014 SMALL REFINERY RULE

The EPA and the Refineries contend that we lack jurisdiction to address the foregoing issue as a result of the 2014 amendment to the regulatory definition of "small refinery." The Clean Air Act generally provides that although challenges to final agency actions which are "locally or regionally applicable" must be filed "in the United States Court of Appeals for the appropriate circuit," challenges to final agency actions identified by the EPA as "based on a determination of nationwide scope or effect" must be filed "in the United States Court of Appeals for the District of Columbia[.]" 42 U.S.C. § 7607(b). The statute also generally specifies that any petition for review under this subsection must be filed within 60 days from the date

79

notice of such promulgation, approval, or action appears in the Federal Register. *Id.*; *see also supra* § III.A. The EPA and the Refineries assert that the Biofuels Coalition is effectively challenging the 2014 Small Refinery Rule, and the 60-day window for any such challenge (which could only be heard in the D.C. Circuit) closed long ago.

The EPA communicated the basis for the 2014 Small Refinery Rule in a document entitled "Regulation of Fuels and Fuel Additives: RFS Pathways II, and Technical Amendment to the RFS Standards and E15 Misfueling Mitigation Requirements." 79 Fed. Reg. 42,128 (July 18, 2014). The EPA explained that in 2010, the agency specified in the definition of "small refinery" that the 75,000 barrels per day ("bpd") threshold determination "should be calculated based on information from calendar year 2006." *Id.* at 42,152. By 2014, however, the agency believed it was inappropriate that "refineries satisfying the 75,000 bpd threshold in 2006 should be eligible for extensions to their small refinery RFS exemption if they no longer meet the 75,000 bpd threshold." *Id.* Accordingly, the EPA proposed modifying the definition of "small refinery" so that the 75,000 bpd threshold applied "in 2006 and in all subsequent years." *Id.* The EPA also proposed specifying that "in order to qualify for an extension of its small refinery exemption," a refinery had to qualify as a "small refinery" for "all full calendar years between 2006 and the date of submission of the petition for an extension of the exemption." *Id.*[5]

_____

[5] The EPA's original proposal appears at 78 Fed. Reg. 36,042 (proposed June 14, 2013). *See id.* at 36,063–64 ("[W]e propose modifying the definition of small refinery so that the crude throughput threshold of 75,000 bpd must apply in 2006 and in all subsequent years.").

The EPA received two comments supporting these proposed modifications, but ultimately decided to issue a different final rule. *Id.* at 42,152, 42,163. The EPA stated that "[a]fter further consideration of this matter," it understood the agency's initial proposal "could unfairly disqualify a refinery from eligibility for small refinery relief based only on a single year's production since 2006." *Id.* at 42,152. The EPA thought it would be improper to treat differently "two refineries whose recent operating conditions were equivalent" if "one refinery exceeded 75,000 bpd in a single year as much as 8 years ago." *Id.* The agency therefore modified the final rule "to require that throughput be no greater than 75,000 barrels in the most recent full calendar year prior to an application for hardship." *Id.* The EPA emphasized that its "primary concern" was "treating refineries with similar performance the same," and argued that the new changes "reasonably implement the statutory definition of 'small refinery,' which indicates that the 75,000 barrel aggregate daily crude oil throughput is for 'a calendar year,' but does not specify which calendar year should be the focus of inquiry." *Id.*

While there may be overlap between the definition of a "small refinery" and the definition of an "extension," the two issues are not the same. Qualifying as a "small refinery" is a necessary but not sufficient condition for an extension. In addition to meeting the definition of a "small refinery," a petitioner must demonstrate that it will suffer disproportionate economic hardship if required to comply with the statute's renewable fuels directive. 42 U.S.C. §§ 7545(o)(9)(A)(ii)(II), 7545(o)(9)(B)(i). A petitioner also must show that it is seeking an "extension" of an

exemption, as opposed to a free-standing "exemption." *Id.* The 2014 Small Refinery Rule establishes *who* may seek an extension of an exemption, but it does not resolve *what* constitutes a valid extension.

This analysis is consistent with the preamble to and the text of 40 C.F.R. § 80.1441. Both of those sources state that to qualify for an extension of the exemption, a "small refinery" must have average daily crude oil throughput of 75,000 barrels or less in the prior year (in contrast to the previous version of the rule, which looked to an applicant's throughput in 2006, and in contrast to the EPA's opening proposal, which looked to an applicant's throughput from 2006 to the date of the petition). *E.g., id.* § 80.1441(e)(2)(iii). But neither the preamble nor the administrative rule contains any discussion of what the word "extension" actually means. The preamble and the administrative rule also contain no indication that statute's use of the word "extension" is ambiguous; the ambiguity the EPA attempted to address expressly pertained to the phrase "small refinery." *See* 79 Fed. Reg. at 42,152 (noting that the statute does not specify which year should be the focus of the 75,000 bpd small refinery calculation).

Tellingly, the EPA itself previously did not treat the 2014 Small Refinery Rule as dispositive on the issue of an "extension" of the exemption. In 2016 – almost two years after the amendment reflected in 40 C.F.R. § 80.1441(e)(2)(iii) became effective, *see* 79 Fed. Reg. at 42,128 – the EPA did not mention its regulatory definition of "small refinery" when denying the Dakota Prairie petition. *Dakota Prairie* Appellate Petition at 8–9 of 17. If the 2014 Small Refinery Rule controlled

82

the meaning of "extension," the EPA would have been required to adjudicate Dakota Prairie's petition based on whether the refinery had average aggregate daily crude oil throughput of 75,000 barrels or less in 2014 and 2015. The EPA did not do that.

Regardless, there is no challenge in the case at bar to the 2014 Small Refinery Rule. The Biofuels Coalition does not seek to nullify it. This court expresses no opinion on its validity. The only remedy sought by the Biofuels Coalition is to vacate the EPA's decisions granting the 2016 and 2017 hardship petitions of Cheyenne, Woods Cross, and Wynnewood. That, in turn, limits our review and the scope of any relief we may grant. *Cf. Alon Refining Krotz Springs, Inc. v. EPA*, 936 F.3d 628, 643 (D.C. Cir. 2019) ("[T]he petitions for review filed in 2017 and 2018 raise no back-door challenge to the 2010 regulation: the petitions contend that EPA in 2017 arbitrarily refused to take account of changing economic conditions, and they seek vacatur only of the 2017 order denying a new rulemaking going forward."). The Biofuels Coalition's petition to this court was neither misdirected to the wrong tribunal, nor untimely by virtue of 42 U.S.C. § 7607(b). We have jurisdiction to determine whether the EPA exceeded its authority in exempting three individual refineries in Oklahoma, Utah, and Wyoming.

For similar reasons, we disagree with the EPA and the Refineries that *Chevron* deference, rather than *Skidmore* review, is in order. Their argument for *Chevron* deference assumes not only that the 2014 Small Refinery Rule is up for grabs in this litigation, but also that the Rule sets forth a permissible construction of the term "extension." Neither assumption is accurate. As discussed, the validity of the 2014

83

Small Refinery Rule is not being disputed here, only the validity of unpublished EPA orders granting small refinery petitions that were not subject to notice-and-comment procedures. Even if the 2014 Small Refinery Rule reasonably fills a gap in the portion of the statute defining a "small refinery" by throughput in an unspecified "calendar year" (an issue we do not decide today), *see* 42 U.S.C. § 7545(o)(1)(K), the Rule does not explain or resolve any ambiguity with respect to the statutory definition of "extension." We are thus bound by *Sinclair*, 887 F.3d at 992–93, which evaluated informal adjudications of small refinery petitions under *Skidmore*.

B.    DISPROPORTIONATE ECONOMIC HARDSHIP

The Biofuels Coalition's second statutory argument takes aim at the EPA's construction of "disproportionate economic hardship." As we explained in *Sinclair*, "hardship" is "suffering," "privation," or "adversity," i.e., something that "makes one's life hard or difficult[.]" *Id.* at 996 (citations omitted). Although the EPA's comment in the Cheyenne order that relief may be warranted "even if the refinery's operations are not significantly impaired" may prompt questions about the agency's interpretation of "hardship," *see* REC2 at 636 n.10, 646 n.41, the Biofuels Coalition does not dig deeper into the meaning of "suffering," "privation," or "adversity." We assume for the sake of argument that at least part of the hardship the EPA sought to address, *see infra* § IV.C, was each refinery's RFS compliance bill for the year in question. REC2 at 593, 596, 652, 688–89, 694.

A "hardship" for a small refinery, however, is not enough. The hardship must be "disproportionate." The amended Clean Air Act "commands the EPA to consider

84

the *disproportionate* impact of the RFS program, which inherently requires a comparative evaluation." *Sinclair*, 887 F.3d at 997 (emphasis in original). "The EPA must compare the effect of the RFS Program compliance costs on a given refinery with the economic state of other refineries." *Id.*; *see also Hermes*, 787 F.3d at 575 (reciting that "the relative costs of compliance alone cannot demonstrate economic hardship because all refineries face a direct cost associated with participation in the program"). The Biofuels Coalition claims that the EPA bypassed this part of the statutory test.

We are satisfied that the EPA did not dispense with a comparative analysis in granting the Refineries' extension petitions. Several metrics in the scoring system created by the DOE in 2011 are designed to be comparative. *See* 2011 DOE Study, REC1 at 490 ("[M]etrics were developed to evaluate whether each of the eighteen refineries that responded to the survey and fall within the scope of the study would suffer an economic hardship relative to an industry standard."). For example, the Disproportional Economic Impact Metric of "Relative refining margin measure" is calculated as a three year average for all small refineries, and "[r]efineries with a negative net average margin were scored a 10; those below the industry average were scored a 5." *Id.* at 527 (emphasis omitted). The Disproportional Economic Impact Metric of "In a niche market" also recognizes "higher than industry refining margins for the niche refiner." *Id.* at 527 (emphasis omitted). The Disproportional Structural Impact Metric of "Renewable fuel blending (% of production)" further provides that refineries which "have greater than the industry average of approximately 32 percent

diesel production receive a score of 5; those at 40 percent diesel or above have a score of 10." *Id.* at 526 (emphasis omitted).

The EPA orders at issue are not as clear as they might have been, but they contain references to one or more of these comparative factors. As to Cheyenne, the EPA highlighted the refinery's negative net refining margin, and considered the score of "10" assigned to the refinery by the DOE for diesel production. REC2 at 643, 645. As to Woods Cross, the EPA stressed the refinery's low net refining margin, along with blending limitations. *Id.* at 684. The EPA also took into account the score of "10" assigned to the refinery by the DOE for lacking a niche market. *Id.* at 683. As to Wynnewood, the EPA again considered net refining margins, plus DOE rankings for diesel production and the presence or absence of a niche market. *Id.* at 738–40. On this record, we cannot say that the EPA eliminated the requirement of consulting industry benchmarks when evaluating the Refineries' assertions of disproportionate economic hardship.

C.    HARDSHIP FROM COMPLIANCE

The Biofuels Coalition's third statutory argument is that the EPA relied on disproportionate economic hardship suffered by the Refineries as a result of something other than RFS compliance.  Part (A) of 42 U.S.C. § 7545(o)(9), in connection with the "[e]xtension of the exemption" that can be effected by a DOE study, directed the DOE to investigate "whether compliance with the requirements" of the RFS program "would impose a disproportionate economic hardship on small refineries."  *Id.* § 7545(o)(9)(A)(ii)(I).  The next clause in Part (A) corroborated that if a DOE study determined a small refinery "would be subject to a disproportionate economic hardship if required to comply" with RFS obligations, then the EPA was obligated to extend the blanket exemption for another two years.  *Id.* § 7545(o)(9)(A)(ii)(II).  The plain language of these provisions indicates that renewable fuels compliance must be the cause of any disproportionate hardship.

The EPA and the Refineries resist this construction of the law, pointing to language in Part (B) of the statute.  Part (B) addresses case-by-case applications, and states that a small refinery may submit a petition "for an extension of the exemption under subparagraph (A) for the reason of disproportionate economic hardship."  *Id.* § 7545(o)(9)(B)(i).  "The phrase 'by reason of' denotes some form of causation," *Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1842 (2018), leading the EPA and the Refineries to argue that small refinery petitions need only be "for the reason of" economic hardship, not "for the reason of" RFS compliance.

This suggested interpretation does not view § 7545(o)(9)(B)(i) in context. Section 7545(o)(9)(B)(i) tells the reader that any individual exemption petition must be "for the reason of" (and thus caused by) disproportionate economic hardship, but it does not attempt to describe what must induce the hardship. Congress did that work in §§ 7545(o)(9)(A)(ii)(I)–(II), and then elucidated that the object of any petition under Part (B) is "an extension of the exemption under subparagraph (A)[.]" *Id.* § 7545(o)(9)(B)(i). Congress went on to remind the EPA that each case-by-case petition under Part (B) must be assessed in light of "the findings of the study under subparagraph (A)(ii) and other economic factors." *Id.* § 7545(o)(9)(B)(ii). Far from being diluted by Part (B), the hardship-caused-by-compliance requirement in Part (A) works together with it.

The agency orders granting the Refineries' extension petitions are not restricted to disproportionate economic hardship caused by RFS compliance. The EPA stated in the Woods Cross and Wynnewood orders that such hardship "can exist on the basis of adverse structural conditions alone," followed by references to "[a] difficult year for the refining industry as a whole" and an "industry-wide downward trend" of lower net refining margins. REC2 at 682, 738–39. The EPA echoed in the Cheyenne order that disproportionate economic hardship may be the result of "a difficult year for the industry as a whole." *Id.* at 645. Macroeconomic conditions surely provide important context for assessing individual small refinery extension petitions. But hardships caused by overall economic conditions are different from hardships caused by compliance with statutory renewable fuel obligations.

88

Even if the EPA's references to structural conditions and the industry as a whole could be characterized as inartful shorthand, the agency concluded that removing RFS obligations for Woods Cross in 2016 and Wynnewood in 2017 would relieve those Refineries' disproportionate economic hardship "in whole or in part[.]" *Id.* at 684, 741. This statement is indecipherable unless the EPA had in mind hardships beyond those caused by RFS compliance. The alleged hardships imposed on Woods Cross and Wynnewood were in the form of RFS compliance expenses. *Id.* at 652, 688–89. Each of those hardships was entirely eliminated once the EPA suspended the Refineries' RFS obligations. The only way the EPA's orders could have offered relief "in part" was if the agency considered disproportionate economic hardship occasioned by something other than complying with the amended Clean Air Act. Granting extensions of exemptions based at least in part on hardships not caused by RFS compliance was outside the scope of the EPA's statutory authority.

V.      THE BIOFUELS COALITION'S ADDITIONAL CHALLENGES

Beyond statutory construction issues, the Biofuels Coalition contends that the EPA's analysis of disproportionate economic hardship was arbitrary and capricious under the APA. *See* 5 U.S.C. § 706(2)(A). The Biofuels Coalition asserts the EPA did not recognize that (1) the Refineries' economic status was relatively favorable, because Cheyenne had a one-time $654 million accounting write-down, Woods Cross's three-year margin was higher than the industry average, and Wynnewood characterized $80.4 million in scheduled turnaround costs as direct operating expenses; (2) overall RIN purchase costs were relatively modest, especially in

89

comparison to the applicable state and local sales tax rate for each refinery; (3) the corporate parents of the Refineries had carryover RINs which could be used to offset the Refineries' yearly RFS obligations, and regardless, the financial health of the parents should have been factored in to each hardship determination; and (4) prior agency studies and other documents showed the Refineries could recoup RFS compliance costs via higher consumer prices.

Our review is "narrow" and "deferential" under the APA's "arbitrary and capricious" standard. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019). An agency need only "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation and internal quotation marks omitted). A decision is arbitrary and capricious if an agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*; *see also Dine Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 839 (10th Cir. 2019) (adding that an agency acts arbitrarily and capriciously if it makes "a clear error of judgment," but recognizing that a "presumption of validity attaches to the agency action" and the burden of proof lies with those challenging such action).

This forgiving standard of review dooms almost all of the Biofuels Coalition's objections. Right or wrong, the EPA's overall assessment of the Refineries' economic status was not arbitrary. There is no evidence in the record that Cheyenne's write-down and Wynnewood's characterization of expenses were improper accounting maneuvers. Cheyenne suffered a loss and had other negative financial characteristics in 2016 even if the write-down is removed from the equation, and Wynnewood had certain financial features from 2016 to 2017 which were consistent with the EPA's analysis. Woods Cross's net refining margin may have been above average in the aggregate, but that margin sharply declined in 2016. Nothing in the amended Clean Air Act or in existing regulations required the EPA to base its decisions on tax rates or parent company information. As a result, it is hard to see how the parental materials for which the Biofuels Coalition seeks judicial notice could show an abuse of discretion. In any event, with only one exception, those judicial notice motions are denied. *See infra* § VI.

There is one objection presented by the Biofuels Coalition, however, that warrants intervention: The EPA ignored or failed to provide reasons for deviating from prior studies showing that RIN purchase costs do not disproportionately harm refineries which are not vertically integrated. This oversight is significant even with deferential review, in part because administrative agencies "are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). An agency must "display awareness that it is changing position" and "show that there are good

91

reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis omitted). Likewise, if the new policy "rests upon factual findings that contradict those" upon which the prior policy was based, the agency must provide a reasoned explanation "for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 515–16. "It follows that an unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Encino Motorcars*, 136 S. Ct. at 2126 (citation, brackets, and internal quotation marks omitted).

The EPA has dedicated a considerable amount of attention to whether unintegrated refineries can recoup RFS compliance costs by passing them on to customers. The agency published a study addressing this topic in 2015. *See* Dallas Burkholder, EPA Office of Transportation and Air Quality, A Preliminary Assessment of RIN Market Dynamics, RIN Prices, and Their Effects (May 14, 2015) ("Burkholder Study"), REC1 at 410–40. The EPA concluded that "[m]erchant refiners, who largely purchase separated RINs to meet their RFS obligations," are "recovering these costs in the sale price of their products." *Id.* at 412. The EPA acknowledged that "there is a direct and obvious cost" in obtaining RINs for merchant refiners, who "do not own fuel blending infrastructure" and "generally purchase RINs from fuel blenders[.]" *Id.* at 437. Still, the EPA found that refineries "are generally able to recover the cost of meeting their RIN obligations in the price of their petroleum blendstocks." *Id.* at 437–38, 440.

92

The agency revisited this topic in 2017. In response to multiple petitions seeking to change RFS "point of obligation" rules, the EPA cited the Burkholder Study and repeated that "merchant refiners are generally not uniquely adversely impacted (relative to integrated refiners)." Denial of Petitions for Rulemaking to Change the RFS Point of Obligation, EPA-420-R-17-008 (November 2017), at 22 & n.57, available at https://nepis.epa.gov ("EPA Point of Obligation Denial," last visited January 17, 2020). The EPA similarly reiterated that while merchant refiners are "directly paying for the RINs they buy on the market, they are passing that cost along in the form of higher wholesale gasoline and diesel prices." *Id.* at 23; *see also id.* (explaining that "[e]mpirical data" support the argument that RIN purchasers "recover the cost of these RINs in the price of the petroleum blendstocks they sell"). The EPA reviewed studies submitted by commenters purporting to show "an inability to 'pass-through' the cost of the RFS program to consumers," but the agency did "not find these assessments convincing." *Id.* at 23–24. In contrast, the EPA found "compelling" other papers demonstrating that "the ability of the merchant refiners to recover the cost of the RINs was complete (not statistically different than 100%) and occurred quickly (within 2 business days)." *Id.* at 25.

At least through the first quarter of 2019, the EPA continued to affirm its policy position that merchant refiners pass through most or all of their RIN purchase costs. The agency reported in March of 2019 that it "conducted an extensive analysis of RIN prices and market dynamics. After studying the data, we concluded that RIN prices generally reflected market fundamentals and that obligated parties (including

parties that purchase separated RINs) recover the cost of RINs in the market price of gasoline and diesel fuel they sell."  Modifications to Fuel Regulations To Provide Flexibility for E15; Modifications to RFS RIN Market Regulations, 84 Fed. Reg. 10,584, 10,607 (proposed Mar. 21, 2019).  The EPA announced the same conclusion in late 2018, adding that "[e]ven if we were to assume the cost of acquiring RINs were not recovered by obligated parties," a cost-to-sales ratio test "shows that the costs to small entities of the RFS standards are far less than 1 percent of the value of their sales."  EPA 2019 Standards, 83 Fed. Reg. at 63,742.

The EPA did not analyze the possibility of RIN cost recoupment when it granted the Refineries' extension petitions.  There is no question that the EPA was aware of the Burkholder Study, because the agency cited it in the background section of the Cheyenne order.  REC2 at 634 n.5.  The EPA has also embraced the pass-through principle in other litigation, including when the agency defended its decision to retain existing point of obligation rules.  *See Alon Refining*, 936 F.3d at 649 ("According to the EPA, refiners recover the cost of the RINs they purchase by passing that cost along in the form of higher prices for the petroleum based fuels they produce.") (citation and internal quotation marks omitted).  Nor can there be serious debate that near-total RIN cost recovery within two business days would be material to any finding of "disproportionate economic hardship" for a refinery.  Yet the agency did not explain whether, to what extent, or why the pass-through principle was inapplicable to Cheyenne.  *Id.* at 644–45.  The EPA's Woods Cross order contains no pass-through analysis either.  *Id.* at 684–85.

94

Especially glaring is the lack of any particularized pass-through analysis by the EPA for Wynnewood. Under the header of "RIN net revenue or cost," Wynnewood acknowledged and attempted to distinguish the Burkholder Study in its hardship petition. *Id.* at 694. Despite Wynnewood's explicit attempt to differentiate the Burkholder Study, however, the EPA did not address this topic when granting the refinery's petition. The DOE did not score the category of "RINs net revenue or cost" for Wynnewood, so the EPA could not have implicitly relied on the findings of that other agency. *Id.* at 740 & n.6. The EPA stated that it generally considered "all of the information submitted by a petitioner," but in the process of extending Wynnewood's exemption, the agency did not discuss any arguments for or against applying the pass-through principle. *Id.* at 740–41. At best, therefore, the EPA ignored its own pass-through studies and analysis. At worst, the EPA abandoned its prior studies and analysis *sub silentio*. In either scenario, the agency's action was arbitrary and capricious.

Cheyenne and Woods Cross argue in this litigation that it would have been improper for the EPA to rely on a general pass-through principle from the Burkholder Study in adjudicating specific refinery petitions. Cheyenne and Woods Cross focus on the following passage from the EPA's 2017 paper:

> While the EPA continues to believe that refiners, including merchant refiners, are generally able to recover the cost of RINs through prices they receive for the petroleum blendstocks they sell, we also acknowledge that there are many diverse factors that impact each individual refiner's profitability and their ability to recover their full cost of production (including crude oil costs, labor costs, capital costs, regulatory and compliance costs, etc.). These factors include, but are

95

not limited to, the refinery's location, their access to various types of crude oil, the local demand and competition for refined products.

EPA Point of Obligation Denial at 27, cited in HollyFrontier Cheyenne & HollyFrontier Woods Cross Br. at viii, 53. Cheyenne and Woods Cross supplement this argument by citing *Ergon-W. Va., Inc. v. EPA*, 896 F.3d 600 (4th Cir. 2018), in which the United States Court of Appeals for the Fourth Circuit held it was arbitrary and capricious for the EPA to rely solely on the Burkholder Study without analyzing specific evidence presented by a small refinery suggesting an inability to "pass the RIN costs on to purchasers because of the local market's low acceptance of blended diesel." *Id.* at 613.

We need not decide whether we agree with the Fourth Circuit's decision, because this case involves a different issue. The problem here is not that the EPA abused its discretion by assigning too much weight to the Burkholder Study, or to the many other academic papers and studies indicating that merchant refineries typically recoup their RIN purchase costs through higher petroleum fuel prices. Nor is the problem necessarily that the EPA committed reversible errors in assessing the "diverse factors" potentially impacting an individual refiner's ability to pass RIN costs on to customers. The difficulty is that the EPA did not address the applicability of the pass-through principle *at all*, even when one of the Refineries attempted to prove individual circumstances warranting the principle's suspension. We do not know whether the pass-through studies previously performed or cited by the EPA matched up with each refinery's individual conditions (thereby precluding a finding

96

of disproportionate economic hardship), because the agency declined to address the issue. The EPA thus "failed to consider an important aspect of the problem," *Motor Vehicle*, 463 U.S. at 43, and its silence ran counter to the record.

VI.    MOTIONS

In a pair of motions, the Biofuels Coalition requests judicial notice of certain documents. These documents include Forms 10-K for the Refineries' parent organizations, the EPA's Point of Obligation Denial, a brief submitted by the EPA in other litigation, memoranda from EPA and National Economic Council officials, and an email thread among EPA employees. With the exception of the Point of Obligation Denial, this opinion relies on none of these materials. We therefore deny as moot the Biofuels Coalition's judicial notice motions as to all but one of the proffered documents.

As to the Point of Obligation Denial, we grant the request for notice to the extent necessary. The document is publicly available on the EPA's website. Information on a government website is subject to notice if, among other things, it is "not subject to reasonable factual dispute" and part of a source "whose accuracy cannot reasonably be questioned[.]" *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 702 n.22 (10th Cir. 2009). Although the EPA says the statements in the Point of Obligation Denial were made in the context of a different proceeding, the agency "does not dispute" their accuracy. EPA Judicial Notice Opposition at 9.

Citing cases such as *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985), the EPA and the Refineries contend that judicial review in matters governed by the APA usually is limited to the existing administrative record. We do not question that general principle. Even so, "we have recognized that consideration of extra-record materials is appropriate in 'extremely limited' circumstances," such as "where the agency ignored relevant factors it should have considered[.]" *Lee v. U.S. Air Force*, 354 F.3d 1229, 1242 (10th Cir. 2004) (citation omitted). That is precisely the purpose for which we have examined the Point of Obligation Denial. No more and no less, the document reflects a relevant policy position that the agency did not specifically analyze when granting the Refineries' extension petitions. Additional special circumstances are that (1) the Biofuels Coalition had no opportunity to participate in compiling the administrative record; and (2) we take judicial notice only of the existence of the statements in the Point of Obligation Denial, not of their substantive truth.

Finally, an organization known as the American Fuel & Petrochemical Manufacturers ("AFPM") asks us to consider its *amicus curiae* brief in support of the Refineries. AFPM describes itself as "a trade association whose members comprise nearly all the petroleum refining capacity in the United States," including several members which "operate small refineries" receiving "exemptions" from RFS requirements. AFPM Motion at 2–3. We grant AFPM's request. *See* Fed. R. App. P. 29(a)(3) (stating that a motion for leave must indicate "the movant's interest" and "the reason why an amicus brief is desirable and why the matters asserted are

relevant to the disposition of the case"). The brief submitted by AFPM has been reviewed by the court and will be considered filed as of the date of AFPM's motion for leave. No refiling is necessary.

VII.   CONCLUSION

For the foregoing reasons, we vacate the EPA orders granting the exemption extension petitions of Cheyenne, Woods Cross, and Wynnewood. We remand these matters to the EPA for further proceedings consistent with this opinion. The Biofuels Coalition's judicial notice motions are denied, subject to one exception explained above. AFPM's motion for leave to file an amicus brief is granted. To the extent consistent with this opinion, we affirm our prior confidentiality orders in this case, meaning that any item previously placed under seal by the parties will remain under seal.